**Dee W. DICKINSON, Appellant,**

**v.**

**R. E. MAILLIARD, Sr., Buena Vista County and Buena Vista County Hospital, Appellees.**

**No. 53776.**

Supreme Court of Iowa.

March 10, 1970.

Patterson, Lorentzen, Duffield, Timmons & Irish, Des Moines, and Welty & Wilcke, Spirit Lake, for appellant.

Gleysteen, Nelson, Harper, Kunze & Eidsmoe, Sioux City, for appellee, R. E. Mailliard, Sr.

Sifford, Wadden & Davis, Sioux City, and Ira Skinner, Jr., Storm Lake, for appellees, Buena Vista County and Buena Vista County Hospital.

LeGRAND, Justice.

This is an appeal from judgment for defendants after a jury verdict in their favor. The action is based on the alleged negligence of the defendant, Dr. R. E. Mailliard, Sr., in "the care, treatment, examination and diagnosis" of plaintiff's injuries and the alleged negligence of the defendant county and defendant hospital (re-

ferred to herein jointly as the hospital) in failing to render him proper care while he was confined there as Dr. Mailliard's patient.

On July 14, 1965, plaintiff was injured in an automobile accident. He was immediately taken to the Buena Vista County Hospital where he was attended by defendant doctor.

Based on a preliminary examination, the doctor ordered x-rays of the plaintiff's dorsal spine, chest, right elbow, and lumbar spine. He diagnosed the injuries as laceration of the right elbow and hand, contusion of the chest, rib fracture, compression fracture of the spine of the 8th, 10th and 11th dorsal vertebrae and a cerebral concussion.

Plaintiff was discharged from the hospital and from Dr. Mailliard's care on July 27, 1965. He still experienced pain and discomfort and within a few days went to his family physician, Dr. Ronald F. Rodawig, Jr. He was first examined by Dr. Rodawig on August 2, 1965, complaining of his inability to concentrate, pain in his neck, pain and numbness of the left arm, and a painful mid-back. Dr. Rodawig found tenderness in the mid-back and tenderness when plaintiff attempted to flex or extend his neck. He also found diminution of sensation to touch in the left arm and hand. He ordered additional x-rays, which disclosed "a fracture-dislocation of the fifth cervical vertebra over the sixth cervical vertebra." Dr. Rodawig immediately applied a cervical collar and transferred plaintiff by ambulance to St. Mary's Hospital in Rochester, Minnesota, where surgery was performed to reduce the fracture and fuse the cervical vertebrae.

Plaintiff's evidence shows some permanent disability in the left arm and hand, the extent of which is not important to this appeal. In all, five doctors and four nurses testified to various matters concerning the diagnosis and treatment of plaintiff's injuries by the defendant doctor and the care accorded him while he was a patient at the hospital. There is considerable testimony detailing his injuries, his uncooperative attitude as a patient, the procedures followed by the various doctors, and the method by which the hospital charted his condition and notified the doctor of his complaints. We refer to specific evidence later as it bears on the particular errors assigned.

As tried below and as presented to us, this controversy turns on whether there was a negligent failure to properly diagnose plaintiff's fracture of the 5th cervical vertebra and whether the ensuing two-week delay caused more permanent or residual damage than if he had received prompt attention for that injury.

■ It is well settled a negligent failure to properly diagnose may itself be malpractice on the part of the attending physician. Wilson v. Corbin, 241 Iowa 593, 599, 41 N.W.2d 702, 705; Wheatley v. Heideman, 251 Iowa 695, 704, 102 N.W.2d 343, 349; Lagerpusch v. Lindley, 253 Iowa 1033, 1037, 115 N.W.2d 207, 210; Barnes v. Bovenmyer, 255 Iowa 220, 228, 122 N.W.2d 312, 316.

The jury found generally against the plaintiff. We do not know if that determination was based on a finding there was no negligence; or one that, although negligence was established, no damage resulted from the delay in diagnosing and treating the injury.

Most of our discussion involves the alleged negligence of the doctor. We discuss only briefly the situation with reference to the defendant hospital. We hold the judgment must be reversed as to the doctor but affirmed as to the hospital.

I. With reference to Dr. Mailliard, plaintiff relies on the following assignments:

(1) Error in refusing to permit Dr. Graham, one of plaintiff's experts, to express his opinion that it was "possible" the delay in diagnosis caused additional residual or neurological damage;

(2) Error in refusing to permit portions of Dr. Graham's deposition to be received on the ground his opinion was speculative, conjectural, and without probative value; and

(3) Error in permitting defendants to cross-examine Dr. Graham by way of a hypothetical question which allegedly assumed facts not in the record and which were contrary to the record testimony.

II. Dr. Graham is a radiologist, certified by the American Boards of Radiology and the American College of Radiology. He is on the staffs of nine hospitals as a radiologist in three states. His qualifications to testify as an expert were not challenged. His testimony was received by way of deposition. At the time the deposition was introduced, various portions of it were stricken upon objection.

At one point the doctor was asked, "Q. * * * Is it possible that had this dislocation fracture been diagnosed on July 14th, or within the matter of a day or two following July 14th, that there might not have been any of this residual or neurological deficit?" This was objected to as "calling for the opinion and conclusion of the witness and that it is improper and does not give a proper medical evaluation; anything is possible; * * * [there is no showing of] reasonable medical certainty on which a medical evaluation is based." This objection was sustained and the record shows the doctor would have answered, "Yes, I think that's a fair statement."

Although we need not reach the specific question raised for reasons hereafter stated, we point out the evidence rejected was admissible within the rule announced in Grismore v. Consolidated Products Co., 232 Iowa 328, 361, 5 N.W.2d 646, 663; Brower v. Quick, 249 Iowa 569, 580, 88 N.W.2d 120, 126; Bradshaw v. Iowa Methodist Hospital, 251 Iowa 375, 383, 101 N.W.2d 167, 172; Bostian v. Jewell, 254 Iowa 1289, 1299, 121 N.W.2d 141, 146; State v. Miller, 254 Iowa 545, 553, 117 N.W.2d 447, 452.

▆ Standing alone, of course, it would not be enough to make a jury question as to *causation*, but the above cases hold this does not make such evidence *inadmissible*. If an expert is qualified, he should be allowed to state his opinion, either as to probable or merely possible causation. The subsequent question of its sufficiency to establish a sufficient showing of causation to submit to the jury depends on the nature of the opinion given together with other evidence bearing on the question.

However, any error in this regard was rendered harmless by the admission of almost identical testimony by Dr. Graham on at least two other occasions.

He was permitted to testify without objection as follows:

"In my practice, I have come across cases where there has been a delay in a diagnosis of fractures and, as an end result, there was no additional harm which showed up by reason of the delay. * * * [I]t would be ·difficult to say with any degree of reasonable medical certainty that the delay caused any additional harm because had this been diagnosed immediately, and, again, making an assumption that a cervical decompression was done, it is feasible and possible that there would have been no neurological deficit or residual. There is a possibility, too, that there still would be a neurological problem."

In another part of his deposition he also said, "I think probably the delay [in diagnosing plaintiff's condition as a fracture-dislocation of the cervical vertebra] contributed quite materially to the residuals." He explained this opinion by saying that in this type of injury the more quickly the pressure is relieved, the less damage results to the central nervous system and its secondary nerve tract outflow.

▆ To say the least, these two statements are not entirely consistent, but they nevertheless contain the very same information plaintiff sought to elicit by the re-

jected testimony. No objection was made to either question. In one place Dr. Graham seems to say the damage was only a "possible" result of the delay; in another that it was "probable." The evaluation of this seeming conflict was, of course, for the jury.

■ Since Dr. Graham testified to the same facts elsewhere, the refusal to permit his answer to the disputed question was not prejudicial.

III. The second error assigned by plaintiff deals with excluded evidence intended to establish negligent diagnosis by defendant doctor. It is apparent plaintiff's whole case depends on such proof.

Plaintiff's evidence showed x-rays were taken at the direction of the defendant doctor, and they included pictures of the immediate cervical area where the fracture later appeared. The fracture was not then detected. There is hot dispute as to whether any facts or circumstances existed which dictated the necessity for taking additional x-rays in order to make a proper diagnosis. This is the critical issue in the case against defendant doctor.

Dr. Graham was prepared to testify that the x-rays taken at Dr. Mailliard's direction the day after the accident disclosed a condition which should have prompted him to order follow-up x-rays. These x-rays, in Dr. Graham's opinion, would have quickly disclosed a fracture of the cervical spine.

Dr. Graham testified he carefully examined the x-rays taken at the defendant hospital at Dr. Mailliard's direction. The following then occurred:

"Q. And what if anything of significance have you noticed with respect to that area [of the cervical spine]? A. Well, I think you can see that there is disorganization at this level right here which * * * is * * *, six and five. And I think you can see that there is an abnormality on this film.

"Mr. Gleysteen: We are going to object to that for the reason that it appears from the answer made that it is speculative. He is making this statement: 'I think you can see—,' 'And I think you can see—' and not a definite opinion.

"Mr. Jacobs: I'll join in the objection.

"Mr. Gleysteen: And I ask that it be stricken from the record, keeping in mind that this is an expert that is testifying.

"Mr. Duffield: I might state that the following questions will point out the relevancy of the answer.

* * * * * *

"The Court: The objection is sustained. That answer may be stricken and the Jury will ignore the last answer made by the deposition witness."

Plaintiff then made an offer of proof of the following portion of Dr. Graham's deposition:

"Question: Specifically at what level [does the abnormality appear]? Answer: It would be at C–5 C–6 level. The joint space appears wider than it should. The articulars or steps are disorganized or at least they are not sharply defined and clean. Question: All right. Now, on the basis of that, what you can see in that x-ray photograph, * * * state whether [or] not that would lend any support to your conclusion that you have previously given here that the dislocation fracture existed at the time the photograph was taken? * * * Answer: Well, should I have seen this film and noted this, I would certainly have recommended on the basis of what I saw here that further examination of the cervical spine be conducted simply because I would want to clarify in my own mind what this meant.' "

Later plaintiff offered the following portion of Dr. Graham's deposition cross-examination. Objection was again sustained on the grounds "heretofore urged."

"Question: Doctor, in [the x-ray taken at Dr. Mailliard's request at Buena Vista

County Hospital] that you have just been testifying about, do you see any fracture at the level of C–5 or C–6 in that x-ray? Answer: I can answer it only this way. There is irregularity there—Question: I didn't ask you that. I asked you if you could see any fracture at that level? Answer" I can't tell whether it is a fracture or not. Question: What? Answer: All I can say is that there is an irregularity there which I would, if I saw it, would pursue. * * * Question: Did you see any dislocation? Answer: I'll just have to answer the same, counsellor, that I see disruption, the nature of which I cannot determine from this. Question: Can you answer that yes or no in regards as to whether you can see any fracture or any dislocation in the x-ray * * * about which you have been testifying? Answer: I can't make a yes or no answer because all I can say is that there's something abnormal and until I further clarify it, I don't know what it is."

It is to be noted the sole objection to this testimony was on the ground it was "speculative and not a definite opinion."

■ We cannot agree that this evidence was inadmissible. Almost all courts have held the opinion of experts need not be couched in definite, positive or unequivocal language. The use of the terms like "I believe"; or "I think"; or "it appears to me" have all been held permissible if it is apparent such language is meant to express the witness' professional opinion.

We reject the argument that the witness was expressing his own indecision or uncertainty about what the x-ray disclosed. We take his testimony to mean, rather, that in his opinion as a radiologist there were conditions shown on the x-ray which made it necessary to conduct further investigation and take additional x-rays before completing the diagnosis.

This is abundantly clear from the offer of proof made. In this offer the witness firmly states his findings in explicit terms which show beyond dispute that his testimony was neither speculative nor indefinite, as plaintiff claims it to be from the isolated answer which was stricken on motion.

He stated he had carefully examined the x-ray. He was relating what he saw there. He was not required to give his reading dogmatically. See II Wigmore on Evidence, Third Ed., section 658, page 768.

There is ample support for this position. 32 C.J.S. Evidence § 439, page 54; 31 Am.Jur.2d, Expert and Opinion Evidence, section 44, page 548; Davenport Elevator Co. v. Halloran, Iowa, 178 N.W. 350, 352; Leathers v. Sikeston Coca-Cola Bottling Co., Mo.App., 286 S.W.2d 393, 396; Elonis v. Lytle Coal Co., 134 Pa.Sup. 264, 3 A.2d 995, 998; Benenati v. Tin Plate Lithographing Co., 29 A.D.2d 805, 287 N.Y.S.2d 528, 530.

This testimony was so important to plaintiff's case that its exclusion requires a new trial. Other doctors testified there was no reason to make further investigation or take other x-rays. The only contrary evidence was that offered by Dr. Graham. This was the very heart of the law suit.

■ We hold the trial court's refusal to admit this evidence was reversible error.

IV. Plaintiff also complains of the hypothetical question which defendant was permitted to pose to Dr. Graham in the deposition cross-examination.

Plaintiff had told a nurse he was experiencing pain and numbness in his hand and arm. This information was given the doctor, who asked him about these symptoms. The doctor says plaintiff just "brushed it off" and replied that "perhaps he had laid on it wrong." Dr. Graham was asked a hypothetical question which assumed plaintiff had denied complaining of pain or numbness in his hand or arm. It is claimed this was error because the record contains no evidence of such denial.

There was no error here. Some leeway is permitted in hypothetical questions on cross-examination, and the trial court has considerable discretion in permitting a party to incorporate therein facts which the jury could find from the record evidence. Here the question fairly presented the nurse's notation of the patient's complaint and the examiner's liberal, but permissible, interpretation of what plaintiff said when questioned by the doctor concerning that complaint. Claimant's response to the doctor that perhaps he had "laid on it wrong," while not a direct denial of pain, permits for the purpose of cross-examination the interpretation which defendant gave it. We hold defendant was entitled to incorporate in this hypothetical question his view of what the evidence showed in this regard. 31 Am.Jur.2d, section 60, page 566; 32 C.J.S. Evidence § 551, page 348; In re Austin's Estate, 194 Iowa 1217, 1222, 191 N.W. 73, 75; Olsen v. Corporation of New Melleray, 245 Iowa 407, 427, 60 N.W.2d 832, 844; Nelson v. Langstrom, 252 Iowa 965, 969, 108 N.W.2d 58, 60; Annotation, 71 A.L.R.2d 6, at pages 13, 15, 16.

In the case of In Re Estate of Telsrow, 237 Iowa 672, 682, 22 N.W.2d 792, 798, we said, "At least some latitude must be showed in the choice of facts stated in such a [hypothetical] question and the trial court has considerable discretion in ruling on an objection thereto. Contestants were entitled to frame the question according to their theory of the case, as their construction of the evidence showed the facts to be or as the jury would have a right to find them."

We find no error in permitting the cross-examination objected to here.

V. We now consider plaintiff's appeal from the judgment for defendant hospital. In asking us to reverse the trial court, he claims:

(1) The court erred in withdrawing his specifications of negligence (a), (d) and (e) against the hospital; and

(2) The court erred in its instruction describing the standard of care required of the defendant hospital.

VI. The first of these assignments deals with the relationship of Dr. Klumpert, staff radiologist, and the hospital. The specifications of negligence which plaintiff thinks should have been submitted assert that the hospital failed to properly care for, treat, examine and diagnose the plaintiff's condition; that it failed to properly take and interpret x-ray pictures; and that it failed to exercise ordinary professional skill in the examination, care, treatment, control and diagnosis of plaintiff while he was a patient.

In both his written brief and in oral argument, plaintiff bases his complaints solely on Dr. Klumpert's conduct, although the doctor was not himself made a party defendant. He asserts the x-rays taken by Dr. Klumpert were inadequate and were improperly interpreted. His theory here is that this prevented a timely diagnosis and early treatment of his fractured vertebra. Plaintiff claims Dr. Klumpert was an agent of the hospital and that the hospital must bear responsibility for his negligence.

We believe the trial court was correct in withdrawing these allegations from the jury. It is generally held a doctor is an independent contractor, not an agent of the hospital whose facilities he uses. We do not say a hospital could never be held accountable for misconduct on the part of one of its staff doctors. We only say that under ordinary circumstances—and under those shown here—the doctor is an independent contractor. Annotation, 69 A.L.R.2d 305, 315; 41 C.J.S. Hospitals § 8c(2), page 346; Christensen v. Des Moines Still College, 248 Iowa 810, 814, 815, 82 N.W.2d 741, 744; Bradshaw v. Iowa Methodist Hospital, 251 Iowa 375, 389, 101 N.W.2d 167, 175, and citations; Shepherd v. McGinnis, 257 Iowa 35, 42, 131 N.W.2d 475, 479.

Some of these cases emphasize the fact that the patient has chosen the doctor.

Here it appears plaintiff did not directly choose Dr. Klumpert. However, the x-rays were taken at the request of his physician, Dr. Mailliard. We do not believe this is a significant difference.

It is apparent the legislature intended to maintain this strict independence of doctors when it enacted certain amendments to chapter 135B, Code of Iowa. These statutory provisions (sections 135B.19–135B.30, Code of Iowa) are not controlling here but they are entitled to consideration in determining the relationship between a hospital and its staff radiologist.

These sections were added to chapter 135B in 1957 by the Fifty-seventh General Assembly. They provide pathology and radiology services performed in hospitals constitute medical services which must be performed by or under the direction and supervision of a doctor, (section 135B.22); that technicians and other personnel employed in the radiology department, *not including doctors,* shall be employees of the hospital, (section 135B.24); that the hospital and doctor in charge of x-ray facilities may enter into a contract providing for percentage compensation and that such a contract shall not create the relationship of employer and employee (section 135B.26); that the hospital admission agreement shall contain a statement that "pathology and radiology services are medical services performed or supervised by doctors, (section 135B.27); that the hospital bill shall include a statement that pathology and radiology charges are for medical services rendered by or under the direction of the named doctor and are collected by the hospital on behalf of the doctor, (section 135B.28); and that fees for radiology services must be paid for as medical and not hospital services, (section 135B.30).

■ We believe it is clearly apparent the legislature did not intend a doctor who is designated as a radiologist for a hospital should forfeit his professional independence as a practicing physician. We hold there was no evidence upon which the jury

could find Dr. Klumpert was an agent of the defendant hospital and the trial court was correct in withdrawing these issues from the jury.

VII. The second assignment of error relative to the hospital deals with Instruction 14 defining standard of care. It told the jury as follows:

" * * * The care which the law requires of a hospital is that in undertaking to care for a patient, the hospital is bound to give such care to the patient as the hospital knew or in the exercise of reasonable care should have known was required, *and this duty is measured by the degree of care, skill and diligence customarily exercised by hospitals generally in the community,* and a failure to meet such standards would constitute negligence on the part of the defendant, Buena Vista County Hospital." (Emphasis added.)

Plaintiff objected to this instruction as follows:

" * * * The instruction advising the jury as to the standard of care required of Buena Vista County Hospital and particularly that part * * * wherein the jury is instructed that the hospital is held to the degree of care, skill and diligence customarily exercised by hospitals generally in the community, [is objected to] in that * * * the standard is not restricted to the community but rather to similar locations under similar circumstances."

We find the instruction given is proper under this record, but we deem it advisable to express our present views on the question of a hospital's duty toward its patients.

The instruction states the general rule which is adhered to by many courts. It is also the rule stated in 40 Am.Jur.2d, Hospitals, section 26, page 869, and 41 C.J.S. Hospitals 8c(3), pages 349–350. Several of our decisions have affirmed judgments in which that form of instruction was used. Bradshaw v. Iowa Methodist Hospital, 251 Iowa 375, 390, 101 N.W.2d 167,

176; Shover v. Iowa Lutheran Hospital, 252 Iowa 706, 712, 107 N.W.2d 85, 88. See also Baker v. United States, 8 Cir., 343 F. 2d 222, 225. No case has been called to our attention in which we have squarely decided its propriety under a specific objection. Our language in the Shover opinion (page 712 of 252 Iowa Reports 107 N.W.2d 85) suggests we have some reservations concerning its use.

However, this standard of care has come under increasing criticism in recent years, and the reason for its early adoption no longer appears to exist. It is doubtful today if there is any substantial difference from one locality to another in the type of hospital services rendered. Hospitals must now be licensed and accredited. They are subject to statutory regulation. In order to obtain approval they must meet certain standard requirements. See chapter 135B, Code of Iowa. It is no longer justifiable, if indeed it ever was, to limit a hospital's liability to that degree of care which is customarily practiced in its own community. This is particularly true when we recognize—as we must—that many communities have only one hospital. Adherence to such a rule, then, means the hospital whose conduct is assailed is to be measured only by standards which it has set for itself. There is no other hospital to which it may be compared.

This would permit a hospital to establish a negligent standard of care and later avoid liability by pointing to its own conduct as the norm by which negligence should be tested. We have brushed aside many of these same arguments in connection with the skill to be exercised by a doctor in attending his patient, and we have long compelled him to abide by the rules of good practice followed generally under similar circumstances. McGulpin v. Bessmer, 241 Iowa 1119, 1131, 43 N.W.2d 121, 128; Grosjean v. Spencer, 258 Iowa 685, 691, 140 N.W.2d 139, 143, and citations.

Among the jurisdictions which have recently receded from the old rule concerning a hospital's negligence are Carrigan v. Sacred Heart Hospital, 104 N.H. 73, 178 A.2d 502, 503; Avey v. St. Francis Hospital and School of Nursing, 201 Kan. 687, 442 P.2d 1013, 1019–1022; Pederson v. Dumouchel, 72 Wash.2d 73, 431 P.2d 973, 978; Darling v. Charleston Community Memorial Hospital, 33 Ill.2d 326, 211 N.E.2d 253, 14 A.L.R.3d 860.

All these authorities hold it is competent to show the standards and practices generally in hospitals, not only in the community itself, but in like communities under like circumstances.

In Avey v. St. Francis Hospital, supra, the court discounted the importance of the locality rule, pointing out that Massachusetts, where the rule originated, has now discarded it. Brune v. Belinkoff, 354 Mass. 102, 235 N.E.2d 793, 795–798. Although there the court was dealing with a doctor's duty, much of the language is equally applicable to hospitals.

At pages 1019 to 1022 of 442 P.2d, the court emphasizes the fact that uniform standards and regulations are usually required for the licensing of hospitals; that these in many instances recognize the differences with respect to services and equipment, depending upon the size and location of the hospital; and that where proper foundation of similarity of conditions is established, the testimony concerning services rendered in like communities or like hospitals is admissible. The recent Illinois case of Darling v. Charleston Community Memorial Hospital, supra, also holds the duty of the hospital is not to be determined by the care customarily offered by hospitals generally in the particular community. It holds such custom relevant but not conclusive. That decision, too, relied on the fact there is now some basic uniformity in standards among hospitals for licensing purposes.

■ We are convinced the correct standard of care to which hospitals should be held is that which obtains in hospitals generally under similar circumstances. In deciding what are "similar circumstances,"

the jury may consider the customs and practices followed in the particular community and like communities as one element, but these are not conclusive.

 Having said this much, however, we hold the instruction given in the present case was not reversible error. As pointed out in many of the foregoing authorities, there must be competent evidence upon which to find that a hospital has failed to meet the standard of care required of it. Here plaintiff made no effort to show the standard of care practiced in the Buena Vista County Hospital was different from, or inferior to, that practiced in other like communities. He produced no evidence to establish *any* standard of care. Under such circumstances it would have been error to let the jury determine that the practices of the defendant hospital did not meet those of hospitals in like communities. There was a total absence of evidence upon which such a finding could be made.

 VIII. In this assignment of errors, plaintiff raises one other matter which he apparently abandoned. He assigns as error the failure of the court to instruct the jury on the issue of indivisible damages, including both those caused by the accident itself and those resulting from delay in diagnosis and treatment. No authorities are cited to support this contention. It was not argued in plaintiff's written brief nor was it taken up in oral presentation. Under rule 344, Rules of Civil Procedure, we deem this to have been waived and give it no consideration. Allerton-Clio-Lineville . Community School District v. County Board of Education, 258 Iowa 846, 848, 140 N.W.2d 722, 723; Quint-Cities Petroleum Co. v. Maas, 259 Iowa 122, 126, 143 N.W.2d 345, 347, and citations.

 IX. Finally, we find no error either in the court's refusal to instruct on the failure of the hospital to call Mrs. Bayliss as a witness. Mrs. Bayliss is a nurse employed by the hospital when plaintiff was a patient and who was still in its employ at the time of the trial. Four nurses testified. The hospital records were introduced in evidence. There is no showing Mrs. Bayliss had information bearing on the sole question whether the doctor had been properly notified of plaintiff's complaints concerning pain and numbness in his left hand and arm. The only evidence about Mrs. Bayliss occurred on questionable rebuttal testimony when one of the other nurses said many of the entries in the hospital records were in her handwriting. There is nothing in the record to suggest the entries important to this appeal were made by her nor that she had information other than that already testified to by the other nurses.

Under these circumstances plaintiff was not entitled to an instruction that failure to produce Mrs. Bayliss as a witness permitted an inference her testimony would have been unfavorable to the hospital. State v. Parker, Iowa, 151 N.W.2d 505, 512, 513; State v. Williams, Iowa, 155 N.W.2d 526, 530, and State v. Thomas, Iowa, 162 N.W. 2d 724, 728. See also Quint-Cities Petroleum Company v. Maas, 259 Iowa 122, 127, 143 N.W.2d 345, 348, and Annotations at 5 A.L.R.2d 896.

X. For the reasons stated in Division III hereof we reverse and remand for a new trial as to the defendant, R. E. Mailliard, Sr. We affirm as to the defendants, Buena Vista County and Buena Vista County Hospital.

Affirmed as to defendants, Buena Vista County and Buena Vista County Hospital; reversed and remanded for new trial as to defendant, R. E. Mailliard, Sr.

All Justices concur, except RAWLINGS and UHLENHOPP, JJ., who take no part.