PATRICIA A. WICKLIFFE, as Special Administratrix of the Estate of ANGELA R. WICKLIFFE, Deceased, on Behalf of the Heirs of the Estate, and PATRICIA A. WICKLIFFE, and JOHN C. WICKLIFFE, Individually, as Natural Parents of Said Deceased Minor, Appellants, *v.* SUNRISE HOSPITAL, INC., a Nevada Corporation, Respondent.

No. 15668

September 24, 1985                                    706 P.2d 1383

*J. R. Crockett, Jr., Ltd.* and *Jonathan C. Reed,* Las Vegas, for Appellants.

*Barker, Gillock & Perry* and *Kerry L. Earley,* Las Vegas, for Respondent.

## OPINION

By the Court, MOWBRAY, J.:

Appellants John and Patricia Wickliffe appeal from a judgment for respondent Sunrise Hospital in an action for the wrongful death of their teen-aged daughter Angela. While recovering from successful surgery at Sunrise, Angela suffered a respiratory arrest and died twelve days later. We hold that the district court erred by excluding the testimony of the Wickliffes' expert witness under the locality rule. We reverse and remand for a new trial applying a national standard of care to Sunrise.

### THE FACTS

At 7:40 a.m. on December 7, 1978, Angela Wickliffe underwent an operation at Sunrise Hospital to correct the curvature or scoliosis of her spine. Angela was a healthy thirteen-year-old. The operation, called a Harrington rod procedure, was performed by Dr. James Ogilvie, his first surgical assistant, and Dr. William Kemp, an anesthesiologist. The operation was uneventful and successful. At the end of surgery, at 9:40 a.m., Angela was given narcan, a narcotic antagonist, to reverse the effects of the anesthesia she had received.

Once in the recovery room, at 9:50 a.m., Angela showed signs of delirium and began thrashing about. Dr. Kemp orally ordered the recovery room nurse to give Angela 2 milligrams (mgs.) doses of morphine sulphate (morphine) until she calmed down. Morphine's most common side effect is respiratory depression, *i.e.*, a slowing down of breathing. Dr. Kemp observed Angela respond favorably to the first 2 mgs. of morphine. Then, Dr. Kemp left the recovery room to assist in another surgery. The nurse administered a total of 12 mgs. of morphine over twenty minutes. Dr. Kemp testified that he did not expect the nurse to give as much as 12 mgs. since two seemed to have an effect. Because Angela was still restless, the nurse obtained permission from Dr. Kemp to give Angela valium and administered 1 mg. of it. Dr. Ogilvie observed Angela in the recovery room at 10:30 a.m. and found her to be recovering normally. He did not know at the time that she had been given narcan and morphine after the operation. Dr. Ogilvie testified that Angela may have appeared normal after such a large dose of morphine because the narcan was still in her system.

At 11:20 a.m., Angela was transferred from the recovery room to her room on the surgical floor. The recovery room nurse gave the head nurse of the surgical floor a report on Angela's condition. This report included the fact that Angela had been given 12 mgs. of morphine and some valium in the recovery room. Patricia Wickliffe joined Angela in her room. Angela's assigned nurse was at lunch so a patient care attendant[1] checked Angela's vital signs at 11:30 a.m. and immediately recorded or "charted" them. Vital signs include pulse, respiration, blood pressure, temperature and the quality of the patient's breathing and consciousness. Angela's vital signs were normal at this time. Dr. Ogilvie visited Angela in her room soon afterwards and assessed her condition as good.

At noon, a lab technician drew a blood sample from Angela, as ordered by Dr. Ogilvie's partner. Angela was awake enough to help the technician. Angela's assigned nurse refilled her water pitcher at 12:15 p.m. The nurse noticed Angela was snoring. Snoring-like sounds, if accompanied by other signs of distress, can be a sign of respiratory depression. The nurse charted her observations two hours later. At 12:30 p.m., a nursing assistant brought Angela's lunch tray into her room. Angela was snoring. The nursing assistant left the room to check to make sure Angela was to have lunch. When she returned, the nursing assistant noticed Angela was no longer snoring. Mrs. Wickliffe could not wake Angela. The nursing assistant discovered Angela had no pulse and was not breathing and called for help. The head nurse ran into the room and began cardiopulmonary resuscitation. Doctors were later able to revive Angela to a comatose state. She never regained consciousness, however, and died from brain damage from a lack of oxygen on December 19, 1978.

Dr. Ogilvie testified that Angela died from respiratory depression due to the administration of morphine. Three other doctors testified they could not form an opinion as to the cause of Angela's death.

Patricia and John Wickliffe filed suit against Sunrise for the wrongful death of their daughter. The Wickliffes alleged negligence of the hospital employees, the nurses. The Wickliffes did not sue Angela's doctors who were not hospital employees.

At trial, the Wickliffes sought to prove that Sunrise violated its own procedures and gave Angela nursing care that fell below certain minimum standards in the profession. Specifically, the Wickliffes attempted to establish that Sunrise's written procedures and the standard of care for nursing in general required that the vital signs of a post-surgical patient be monitored every

---

[1]A patient care attendant is not trained as a nurse. This particular attendant received three months training at Sunrise.

fifteen minutes for the first hour the patient is back on the surgical floor. Angela's vital signs were not checked between her return to the floor at 11:30 a.m. and the discovery of her respiratory arrest at 12:40 p.m. The Wickliffes also alleged that the nurses failed to give Angela the appropriate care under the special circumstances of her case. These circumstances included the fact that she was given a substantial dose of morphine in the recovery room and thereafter displayed symptoms of respiratory depression.

The Wickliffes were hampered in their efforts to prove the standard of care for post-surgical patients in general and at Sunrise in particular by evidentiary rulings of the district court. The testimony of Carolyn Sandler, R.N., an expert witness on nursing procedures, was excluded in its entirety. The testimony of Marjorie Woods, R.N., a retired nursing supervisor from Sunrise, was excluded from the Wickliffes' case-in-chief. In addition, important and relevant documentary evidence was deemed inadmissible.

The jury returned a verdict for Sunrise. The Wickliffes appeal from the judgment entered on this verdict. For the reasons set forth below, we reverse.

## THE LAW

On appeal, the Wickliffes challenge the exclusion of their expert witness, Nurse Sandler. At a hearing outside the presence of the jury, Nurse Sandler testified that in her opinion Angela did not receive the minimal care due a post-surgical patient who had been given a narcotic in the recovery room. According to Nurse Sandler's testimony, the national standard of nursing care in 1978 required that a nurse observe a post-operative patient and take the patient's vital signs every fifteen minutes for at least the first hour the patient is back on the surgical floor.[2] Nurse Sandler based her opinion upon the level of care established by standards promulgated by the American College of Utilization Review Physicians (ACURP) and by the Joint Commission on Accreditation of Hospitals (JCAH) and from her own familiarity with nursing procedures.

After three years of nursing school, Nurse Sandler received her degree as a registered nurse in 1965. She was certified in the nursing specialties of intensive care, coronary care, emergency room and advanced coronary life support. Nurse Sandler is also certified in quality assurance by ACURP. At the time of trial, she had been conducting quality reviews of various hospitals in the Philadelphia, Pennsylvania, area for four years. Her duties

---

[2]Because Angela's assigned nurse was at lunch when she returned to the surgical floor, a patient care attendant took her vital signs at 11:30 a.m. No nurse or other personnel took Angela's vital signs again until 12:40 p.m.

included determining whether a hospital satisfied the national requirements for accreditation by JCAH. Nurse Sandler has also been a nursing supervisor and the head nurse of a medical-surgical unit at hospitals in New Jersey. She testified that she was familiar with national nursing policies and procedures but not with nursing practices in Las Vegas in particular.

The district court excluded Nurse Sandler's testimony under the so-called "locality rule." The locality rule provides that the medical treatment of a patient is measured against the standard of care acceptable in the local community. *See* Waltz, The Rise and Gradual Fall of the Locality Rule in Medical Malpractice Litigation, 18 De Paul Law Review 408, 409 (1969). Consequently, "the locality rule was said to require that a medical witness seeking to give opinion evidence in a malpractice action must first show his knowledge of the standards prevailing in the particular locality." Orcutt v. Miller, 95 Nev. 408, 412, 595 P.2d 1191, 1193 (1979) (citing Lockart v. MacLean, 77 Nev. 210, 215, 361 P.2d 670, 673 (1961)). Nearly twenty-five years ago this Court adopted the locality rule for expert witnesses "in the fields of medicine and surgery." *Lockart,* 77 Nev. at 215, 361 P.2d at 673. Presumably, the locality rule applies to hospitals, although this Court has never expressly so held. The locality rule was premised on the rationale that "there exists gross inequality between physicians practicing in large urban areas and those practicing in more remote rural communities. The policy behind the rule was to prevent the small town practitioner from being held to the standard of practice of the more sophisticated urban areas." *Orcutt,* 95 Nev. at 413, 595 P.2d at 1194. *Cf.* Waltz, *supra* at 410.

More recently, this Court recognized that "the reasons underlying the strict locality rule a century ago simply do not justify its continued existence today." *Orcutt,* 95 Nev. at 413, 595 P.2d at 1194. In *Orcutt,* this Court overruled *Lockart* as it applied to physicians who were board certified specialists. Citing advances in medical training and improvements in communications, the *Orcutt* court held, "in order to recover in a medical malpractice case, a plaintiff must demonstrate that the defendant specialist failed to meet the standard of skill and care expected of a reasonably competent practitioner in the same specialty wherever practicing." 95 Nev. at 414, 595 P.2d at 1195. Thus, *Orcutt* adopted a national standard of care, that is, a standard not limited by locality, for board certified specialists. *See.* Annot. 99 A.L.R.3d 1133, §§ 9, 10.

The progress in the medical profession which renders the locality rule inappropriate for board certified specialists likewise affects hospitals. The largely standardized education of doctors means that all hospitals are staffed by physicians with similar training. Hospitals, as well as other health care practitioners, are

informed of the latest medical advances with ever-increasing swiftness. In addition, hospitals are accredited by the JCAH, which "establishes national standards to which all hospitals seeking accreditation must conform." Shilkret v. Annapolis Emergency Hospital Ass'n, 349 A.2d 245, 254 (Md.App. 1975). We note that Sunrise has always been accredited by JCAH. Nursing education and licensing is also standardized. Nurses are licensed after passing an examination in the state where they wish to work and a national examination. A licensed nurse in good standing in one state can practice in another without taking the second state's local examination. For these and other reasons,

> [i]t is doubtful today if there is any substantial difference from one locality to another in the type of hospital services rendered. Hospitals must now be licensed and accredited. They are subject to statutory regulation. . . . It is no longer justifiable, if indeed it ever was, to limit a hospital's liability to that degree of care which is customarily practiced in its own community.

Dickenson v. Mailliard, 175 N.W.2d 588, 596 (Iowa 1970). Rather, the factors discussed above "warrant the adoption of a [national] standard of care for hospitals." Shilkret, 349 A.2d at 254.

We hold, therefore, that a hospital is required to employ that degree of skill and care expected of a reasonably competent hospital in the same or similar circumstances. Dickinson, 175 N.W.2d at 596-97; Shilkret, 349 A.2d at 254. Cf. Orcutt, 95 Nev. at 414, 595 P.2d at 1195. The level of care to which a hospital must conform is no longer subject to narrow geographic limitations but is instead a nationwide standard. Thus, an expert witness who is familiar with the standard of care of a reasonably competent hospital in similar circumstances wherever located may testify in a negligence action against a hospital or its employees. In determining whether circumstances are similar, the district court should consider developments in the profession, availability of special facilities and of personnel with additional training as well as any other considerations relevant to the treatment in question. Shilkret, 349 A.2d at 254.

Because the district court excluded Nurse Sandler's testimony under the locality rule, we reverse and remand for a new trial applying a national standard. On remand, Nurse Sandler may testify.

The Wickliffes also contend that the district court erred in

excluding the testimony of Marjorie Woods, R.N., from their case-in-chief. Nurse Woods was the nursing supervisor at Sunrise from 1965 until her retirement in 1980. She was familiar with procedures in effect at Sunrise in 1978, the year Angela had her surgery and suffered her respiratory arrest. Nurse Woods' name was not on the pre-trial witness list. For this reason, the district court limited her testimony to rebuttal. Because we reverse the judgment for Sunrise on other grounds we need not determine whether this ruling was an abuse of the district court's discretion. *See generally* Southern Pac. Co. v. Watkins, 83 Nev. 471, 435 P.2d 498 (1967). On remand, however, the court is instructed to permit Nurse Woods to testify during the Wickliffes' case-in-chief.

Nurse Woods' testimony was crucial to the admissibility of a rolodex file. The Wickliffes alleged that the rolodex was one of Sunrise's policy and procedures manuals in 1978. A portion of the rolodex entitled "Post-Operative Care After the Recovery Room" read as follows: "Check vital signs and record. Report any variation which would indicate change in patient status. (Usually taken every 15 minutes × 4, then every hour × 4, if stable; more often if necessary and as ordered by physician.)" The rolodex was excluded for lack of foundation. NRS 52.015.[3] According to an offer of proof, Nurse Woods would have testified that the rolodex was the manual in effect in 1978. This testimony, if offered at the trial on remand, would be sufficient to authenticate the rolodex under NRS 52.015. *See* NRS 52.025.[4] If Nurse Woods is able to so testify, the district court should find that a proper foundation has been laid and should admit the rolodex.[5]

Finally, we hold that the district court abused its discretion by

---

[3]NRS 52.015 provides:

    1.  The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence or other showing sufficient to support a finding that the matter in question is what its proponent claims.

    2.  The provisions of NRS 52.025 to 52.105, inclusive, are illustrative and not restrictive examples of authentication or identification which conform to the requirements of this section.

    3.  Every authentication or identification is rebuttable by evidence or other showing sufficient to support a contrary finding.

[4]NRS 52.025 provides:

The testimony of a witness is sufficient for authentication or identification if he has personal knowledge that a matter is what it is claimed to be.

[5]Of course, the Wickliffes may lay a foundation for the admission of the rolodex by any other proper means as well.

excluding the Wickliffes' Exhibits 12 and 13. *See Southern Pac. Co. v. Watkins, supra.* Exhibit 12 was a photocopy of Angela's hospital records except for pages 114 and 123. The pages comprising Exhibit 12 were mailed by Sunrise's custodian of records on December 18, 1978, pursuant to a subpoena received that day. Exhibit 13 consisted of pages 114 and 123. These pages were mailed from the hospital on December 19, 1978, pursuant to the same subpoena. Pages 114 and 123 were the only pages in Angela's records concerning her brief stay on the surgical floor following her surgery. These pages, which overlap in time, record the events surrounding Angela's respiratory arrest. Thus, they contained critical evidence of the nursing care Angela received. The record does not reveal where pages 114 and 123 were on December 18 or why they were not mailed along with the remainder of Angela's records.[6]

The Wickliffes sought to admit Exhibits 12 and 13 in order to bring to the jury's attention questions about how Angela's records were processed by Sunrise.[7] The fact that pages 114 and 123 were separated from the rest of her hospital records suggests that the two most important pages were somehow treated differently. Inferences arising from these facts were highly relevant. The jury should have been allowed to consider them when evaluating the contents of pages 114 and 123. The Wickliffes should have been allowed to present the hospital records to the jury in the same form as they were mailed from Sunrise. Of course, Sunrise would be free to offer an explanation of the separate mailings. Exhibits 12 and 13 should have been admitted. On remand, the district court is instructed to admit them.[8]

## CONCLUSION

We conclude that the district court erred by excluding appellants' expert witness under the locality rule. We hold that hospitals are subject to a national standard of care under similar circumstances. We reverse and remand for a new trial consistent with this opinion.

SPRINGER, C. J., and GUNDERSON, STEFFEN, and YOUNG, JJ., concur.

---

[6]Dr. Ogilvie testified that he had not seen page 114 when he prepared a final summary of Angela's case following her death on December 19, 1978.

[7]The Wickliffes' Exhibit 1 consisted of Angela's records as a whole.

[8]We also hold that the district court did not err in giving Instruction 13-F because the instruction was supported by the evidence. Beattie v. Thomas, 99 Nev. 579, 668 P.2d 268 (1983). Instruction 13-F concerned the nonliability of the hospital for the consequences of treatment by Angela's physicians.