Thomas J. BIDDLE, As Administrator for the Estate of Sandra Kay Biddle, Deceased, Appellant,

v.

SARTORI MEMORIAL HOSPITAL and City of Cedar Falls, Iowa, Appellees.

No. 92–85.

Supreme Court of Iowa.

June 22, 1994.

Walter T. Hart and Michael M. Sellers of Dreher, Simpson, and Jensen, P.C., Des Moines, for appellant.

Edward J. Gallagher, Jr., and Thomas C. Verhulst of Gallagher, Langlas & Gallagher, Waterloo, P.C., for appellees.

Considered by CARTER, P.J., and NEUMAN, SNELL, ANDREASEN, and TERNUS, JJ.

NEUMAN, Justice.

This is an appeal from pretrial rulings and a defense verdict rendered in a medical malpractice action. Finding no error, we affirm.

The case stems from the tragic death of Sandra Biddle, a thirty-nine-year-old mother who became ill after eating a hot dog at a college football game during a parents' weekend celebration. Complaining of nausea, weakness, chest pains, and shortness of breath, she was rushed by ambulance to Sartori Memorial Hospital in Cedar Falls. There she was admitted as a possible cardiac patient. Following an examination by emergency room physician J. Douglas Watts, however, she was treated instead for gastroenteritis. Antacid and antinauseant medications were administered and gave some relief. By around 11:30 p.m. Sandra expressed a desire to return to her motel to sleep. She was discharged from the hospital with instructions to return if her condition worsened in any way. She died of heart failure approximately four hours later.

Plaintiff Thomas Biddle, Sandra's husband and administrator of her estate, sued Dr. Watts, the hospital, and the City of Cedar Falls (municipal owner of the hospital) for alleged negligence in Sandra's diagnosis and treatment. Prior to trial, Biddle reached a sizable settlement with Dr. Watts and his malpractice insurance carrier. Trial proceeded against the remaining defendants. After listening to four weeks of testimony, a jury returned a defense verdict. This appeal followed.

### I. *Adjudication of law points.*

Biddle's settlement with Dr. Watts prompted a pretrial controversy over the hospital's remaining liability—if any—for the doctor's negligence, separate and apart from any independent acts of negligence that could be proven against the hospital or its staff. In a motion to adjudicate law points, the hospital noted that Biddle's petition, with one division devoted to Dr. Watts' negligence and a second devoted to claims against hospital personnel, asserted no claim of vicarious liability. Nor did Biddle's answers to interrogatories claim or infer an employment relationship between the doctor and hospital that would support a claim of respondeat superior. Aside from this alleged insufficiency in the pleadings, the hospital argued that any liability premised on Dr. Watts' negligence would have been discharged upon Biddle's settlement with him. The district court agreed on both counts, ruling as a matter of law that the issue of the hospital's vicarious liability for the acts of Dr. Watts had not been pled and, in any event, settlement with the doctor released the hospital from any vicarious liability based on the doctor's negligence.

Preliminarily we are faced with the question of whether Dr. Watts is an employee of the hospital or merely an independent contractor. The distinction is important, of course, because vicarious liability rests on proof of an agency relationship. *Brosamle v. Mapco Gas Prods., Inc.,* 427 N.W.2d 473, 475 (Iowa 1988); *Maine v. James Maine & Sons Co.,* 198 Iowa 1278, 1281, 201 N.W. 20, 21 (1924). In Iowa a physician is customarily regarded as an independent contractor, not an employee of the facility served. *Dickinson v. Mailliard,* 175 N.W.2d 588, 594 (Iowa 1970). The determination, however, turns on the facts of each case. *Id.* Here the district court declined to rule as a matter of law on the status of Dr. Watts, preserving the question for trial. The issue was effectively removed from the jury, however, by the court's adjudication of law points. Thus for purposes of considering the issues raised by Biddle on appeal, we will assume that the jury could have found Dr. Watts was an employee of the hospital.

Regarding the sufficiency of the pleadings, Biddle argues on appeal that a reasonable person reading the petition as a whole would surely be on notice that the litigation sought to hold the hospital liable for the negligence of Dr. Watts. We are not so convinced. Even our liberal notice pleading rules require a simple statement of the prima facie elements of a claim. *Stessman v. American Black Hawk Broadcasting Co.,* 416 N.W.2d 685, 686 (Iowa 1987). A claim of vicarious liability under the doctrine of respondeat superior rests on two elements: proof of an employer/employee relationship, and proof that the injury occurred within the scope of that employment. *Jones v. Blair,* 387 N.W.2d 349, 355 (Iowa 1986). Neither allegation appears in Biddle's petition nor in discovery documents filed before trial. *See Kester v. Bruns,* 326 N.W.2d 279, 284 (Iowa 1983) (notice pleading permits party to postpone specificity from pleading to pretrial stage, but does not dispense with it altogether). Other jurisdictions have dismissed similar claims against physicians on this ground. *See, e.g., Stein v. Baum,* 89 Ill.App.2d 142, 148, 232 N.E.2d 96, 99 (1967); *Emory Univ. v. Porter,* 103 Ga.App. 752, 753, 120 S.E.2d 668, 668–69 (1961).

We decline to rest our decision on the pleading issue, however, because we believe a more important question is raised by the court's ruling on the legal effect of Biddle's settlement with the doctor. Biddle contends that Iowa's comparative fault act permits a jury to consider the fault of parties secondarily liable (like the hospital) and assess damages accordingly, notwithstanding settlement between the claimant and the party primarily at fault. The hospital counters that although it remained liable for its own independent acts of negligence, any claim based on imputed fault was satisfied in full by Biddle's settlement with the doctor. The dispute is one with which many other courts have wrestled. *See generally* Vitauts M. Gulbis, Annotation, *Release of, or Covenant Not to Sue, One Primarily Liable for Tort, but Expressly Reserving Rights Against One Secondarily Liable, as Bar to Recovery Against the Latter,* 24 A.L.R.4th 547 (1983). It is a matter of first impression for this court.

The crux of Biddle's argument is that any distinction drawn between the hospital's vicarious liability and its liability as a joint tortfeasor are irrelevant under a comparative fault scheme. He claims the jury should have been permitted to sort it all out and assess additional damages against the hospital based on the doctor's fault irrespective of the settlement. In support he relies heavily on our decision in *Thomas v. Solberg,* 442 N.W.2d 73 (Iowa 1989). We are convinced, however, that his reliance on the case is misplaced.

*Thomas,* not unlike the case before us, involved multiple defendants, two of whom settled before trial. The impact of the settlement became an issue when the jury returned a verdict for plaintiff that was less than the amount received in the settlement. The question before us was whether, under our comparative fault act, the favorable settlement should inure to the benefit of the plaintiff or the nonsettling defendant. *Id.* at 74. In other words, we considered whether the plaintiff's recovery should be reduced by the amount paid by the settling defendant (pro tanto), or whether the recovery against a nonsettling defendant should be reduced by

the percentage of fault attributed to the settling defendant (proportionate credit). *Id.* at 75. We reasoned that the combined effect of Iowa Code sections 668.7 and 668.3(2)(b) (1985)[1] compelled application of the proportionate credit rule, even though the result meant a greater total recovery to the plaintiff than the jury awarded. *Id.* at 78. In so concluding, we necessarily rejected the "one recovery policy" underlying the pro tanto credit rule. *Id.* at 77. This rejection, Biddle claims, opens the way for the additional recovery he seeks here.

The problem with Biddle's reliance on *Thomas* is that the case did not address the fundamental distinction between the full recovery permitted under the doctrine of joint and several liability, and the limitations inherent in a claim that rests on the doctrine of vicarious liability. In *Thomas* the settling and nonsettling defendants were strictly joint tortfeasors. The opinion specifically recognized, but left unaddressed, the issues raised upon settlement where claims are purely derivative, noting chapter 668 does not deal with the "viability and postsettlement survival" of indemnity or other vicarious liability issues. *Id.* at 75.

In cases more closely analogous to the one before us, courts have addressed head-on this important distinction. In *Glover v. Tacoma General Hospital,* 98 Wash.2d 708, 722–23, 658 P.2d 1230, 1238–39 (1983), the Washington Supreme Court contrasted the doctrine of joint and several liability—which permits a plaintiff to proceed against one or all of the joint tortfeasors to obtain a full recovery—with vicarious liability, a doctrine imposed as a matter of public policy to permit recovery against the principal—not for its own conduct, but for the conduct of another. It concluded that a reasonable settlement with the agent effectively adjudicates and satisfies the vicarious claim. *Id.* at 722, 658 P.2d at 1238. The North Dakota Supreme Court, in the case on which the district court relied, articulated the distinction this way:

> The "percentage of negligence" attributable to the conduct of the servant constitutes the entire "single share" of liability attributable jointly to the master and servant. . . . Because this percentage of negligence represents the "single share" of liability covered by the common liability of the master and servant, the master is necessarily released from vicarious liability for the released servant's misconduct.

*Horejsi v. Anderson,* 353 N.W.2d 316, 318 (N.D.1984). Similarly, in *Copeland v. Humana of Kentucky, Inc.,* 769 S.W.2d 67, 70 (Ky.App.1989), the court held that because vicarious liability derives solely from the principal's legal relation to the wrongdoer, settlement with the tortfeasor removes the basis for any additional recovery from the principal upon the same acts of negligence.

We also note that when a comparative fault statute like ours extinguishes the nonsettling party's right to contribution following settlement, similar equitable considerations favor release of the principal in the vicarious liability context. *See Glover,* 98 Wash.2d at 724, 658 P.2d at 1239; Iowa Code § 668.7 (release "discharges [settling party] from all liability for contribution"). In the case before us, were the hospital found liable for its own negligent conduct, the doctor's pretrial settlement would prevent the hospital from pursuing him for contribution. Iowa Code § 668.7. Such an outcome would clearly advance the goal of voluntary settlement

---

1. Iowa Code § 668.3(2)(b) pertinently provides:
    In the trial of a claim involving the fault of more than one party to the claim, including third-party defendants and persons who have been released pursuant to section 668.7, the court [shall instruct the jury to answer special interrogatories or make findings concerning]:
    *b.* The percentage of the total fault allocated to each claimant, defendant, third-party defendant, and person who has been released from liability under section 668.7. For this purpose the court may determine that two or more persons are to be treated as a single party.

Iowa Code § 668.7 states:
    A release, covenant not to sue, or similar agreement entered into by a claimant and a person liable discharges that person from all liability for contribution, but it does not discharge any other persons liable upon the same claim unless it so provides. However, the claim of the releasing person against other persons is reduced by the amount of the released person's equitable share of the obligation, as determined in section 668.3, subsection 4.

of controversies favored by the law. *Waechter v. Aluminum Co. of Am.*, 454 N.W.2d 565, 568 (Iowa 1990). The doctor's settlement would not be protected, however, were a cause of action permitted to go forward against the hospital based on vicarious liability for his acts. This is because of the well settled rule that a principal found vicariously liable for the negligent acts of an agent retains a right of full indemnity against the actual tortfeasor. *Dairyland Ins. Co. v. Concrete Prods. Co.*, 203 N.W.2d 558, 564 (Iowa 1973); *Graham v. Worthington*, 259 Iowa 845, 866, 146 N.W.2d 626, 640 (1966); *accord Sweeny v. Pease*, 294 N.W.2d 819, 822 (Iowa 1980). This right of indemnity held by the principal is neither governed by chapter 668 nor otherwise tempered by its provisions regarding contribution among joint tortfeasors. *Thomas*, 442 N.W.2d at 75; *Rees v. Dallas County*, 372 N.W.2d 503, 505 (Iowa 1985). The potential for enforcement of such a right, were a derivative claim permitted to proceed, would clearly have discouraged rather than encouraged settlement of the controversy before us, contrary to sound public policy. *See Copeland*, 769 S.W.2d at 69–70 (public policy favors discharge of hospital upon release of physician thereby avoiding circuity of action that is merely derivative and secondary); *Estate of Bruce v. B.C.D., Inc.*, 396 F.Supp. 157, 160, 161–62 (S.D.Iowa 1975) (covenant to release employee operates to discharge employer in respondeat superior case, thereby avoiding futile circuity of litigation).

■ In summary, we believe the district court correctly ruled that Dr. Watts' settlement with Biddle extinguished any further claim against the hospital on a theory of vicarious liability. The doctor and hospital were properly "treated as a single party" for purposes of the release. Iowa Code § 668.-3(2)(b). By releasing the doctor, Biddle satisfied the percentage of fault attributable to him and, vicariously, attributable to the hospital. That is, the settlement wiped out any fault derived from the doctor's conduct, separate and apart from the hospital's own negligence, for which it remained accountable at trial. *Horejsi*, 353 N.W.2d at 318. No ground for reversal appears.

## II. *Motion for new trial.*

■ In posttrial motions, Biddle asserted that the jury's verdict for the hospital was contrary to the evidence, thus entitling him to a new trial as a matter of law. The district court disagreed, conceding it might have reached a different result but nevertheless finding support in the record for the jury's decision. We find no error in its judgment.

The proof at trial was sharply controverted. Biddle sought to establish that hospital staff failed to accurately document Sandra's medical history and symptoms, resulting in a failure to administer adequate treatment. Various experts supported his claims. Dr. Robert Hegeman, an emergency department physician, testified that the symptoms Sandra exhibited at the emergency room dictated performance of an EKG before Dr. Watts eliminated a diagnosis of cardiovascular problems. He was joined in this opinion by a cardiologist, Dr. Charles Cagin. Both believed Sandra was suffering from myocardial infarction (MI) while in the emergency room.

Dr. Cagin further testified that the emergency room nurses violated their standard of care by failing to chart abnormal blood pressures reportedly shown by the automatic blood pressure cuff. On cross-examination, however, he conceded that the nurses may have fulfilled their duties had they relayed manual blood pressure readings to Dr. Watts orally. He agreed that nurses have no duty to order tests, diagnose the patient, or determine whether a patient should be admitted.

Rosemary Moriarty, an emergency room nurse, testified the nurses breached their duty of care by failing to recognize and document MI symptoms, failing to record Sandra's family medical history, and failing to report manual blood pressure readings to Dr. Watts. Although both Dr. Watts and the nurse on duty, Carol Eastman, testified that Sandra gave no history of heart problems and that blood pressure readings were transmitted orally, Moriarty claimed their testimony must have been untruthful. She also claimed that although the physician has the responsibility to diagnose the patient, nurses

have a corresponding duty to document what they believe is an incorrect diagnosis.

The pathologist who performed Sandra's autopsy identified the cause of death as two occluded coronary arteries. No evidence of other arteriosclerotic condition appeared. He further reported that the heart attack occurred four to six hours before her death, thus confirming earlier testimony that she suffered an MI while in the emergency room.

For the hospital, expert emergency room physicians John Dunn and Robert Singer, and emergency nurse Terri Mason, each testified that the nursing staff's documentation exceeded the requisite standard of care for an emergency room setting. They asserted that in the emergency room the primary communication between doctors and nurses is verbal, not written. Dr. Dunn rebutted nurse Moriarty's claim that nurses have either the authority or the duty to diagnose a patient suffering from myocardial infarction, or to question a doctor's diagnosis. He also testified that Sandra's family medical history would have been irrelevant given her unusual condition. Both physicians also stated that the record revealed no failure by the nurses to give Dr. Watts all the information he needed to make a proper diagnosis. Finally, neither doctor believed Sandra was suffering from MI while she was in the hospital's care.

In addition to this expert testimony, the jury heard from Biddle, Dr. Watts, and the nurses in attendance on the night Sandra died. Taken together, we believe the record adequately supports the jury's verdict for the hospital. The most damaging evidence offered by Biddle's experts placed the blame squarely on Dr. Watts, not the nursing staff. Indeed, everyone present in the emergency room that night, including Dr. Watts, testified that he was fully informed of her symptoms. Even Biddle's experts concurred in their belief that the ultimate diagnosis and decision to discharge rested with Dr. Watts. This evidence certainly was not so one-sided as to compel a verdict for the plaintiff. *Cf. Hickson v. Martinez,* 707 S.W.2d 919, 923 (Tex.App.1985) (jury verdict subject to reversal where patient died after emergency room doctor, failing to diagnose life-threatening condition, rendered no treatment at all).

When evidence is in conflict, such as it was here, we entrust the weighing of testimony and decisions about the credibility of witnesses to the jury. *State v. Grimme,* 338 N.W.2d 142, 146 (Iowa 1983). We therefore affirm the judgment rendered upon the jury's verdict.

AFFIRMED.