# IN THE SUPREME COURT OF IOWA

No. 12–0283

Filed November 8, 2013

**PAMELA SUE HOOK,**

Appellee,

vs.

**TITO TREVINO**, Individually, and
**TITO TREVINO** d/b/a **TREVINO LAW OFFICES,**

Appellants.

Appeal from the Iowa District Court for Webster County, Gary L. McMinimee, Judge.

Defendant attorney appeals judgment on legal malpractice claims, and plaintiff cross-appeals interest issue. **AFFIRMED ON APPEAL, REVERSED ON CROSS-APPEAL, AND REMANDED WITH INSTRUCTIONS.**

Thomas J. Joensen and Thomas M. Boes of Bradshaw, Fowler, Proctor & Fairgrave, P.C., Des Moines, for appellants.

Marc S. Harding and David A. Hirsch of Harding Law Office, Des Moines, for appellee.

**WATERMAN, Justice**.

This legal malpractice action presents three questions of first impression. In *Hook v. Lippolt*, we held the defendants in plaintiff Pamela Hook's personal injury action—the State of Iowa and a volunteer driver for the Iowa Department of Human Services—were entitled to summary judgment under the statute of limitations and volunteer-immunity provisions of the Iowa Tort Claims Act, respectively. 755 N.W.2d 514, 517 (Iowa 2008). Hook then brought this malpractice action against her attorney in that case, Tito Trevino, who appeals from the judgment on the jury verdict in her favor. Hook cross-appeals a ruling denying her claim for additional interest.

First, we must decide an issue not reached in *Lippolt*—whether the driver's volunteer immunity precludes the state's respondeat superior liability for his negligence. If so, Hook's legal malpractice claim against Trevino fails because she could not have recovered in the "case within the case" had it been timely filed against the state. We hold that this defense is personal to the driver and does not extend to the state.

Second, we must decide whether Trevino can reduce the malpractice-damage award by the contingent fee he would have taken if the underlying action had been successful. Courts in other jurisdictions are divided on this issue. We adopt the majority and better-reasoned rule reflected in the Restatement (Third) of the Law Governing Lawyers, declining such a setoff because Trevino never earned the fee and Hook must pay new counsel who prosecuted the malpractice action.

Third, we must determine what interest is recoverable. Hook sought interest from the date the underlying action would have been tried. The district court denied that request and awarded interest on the entire judgment from the filing date of the malpractice action. We

conclude Hook is entitled to interest running from December 9, 2004, the date by which her underlying action should have been tried, absent Trevino's negligence. Accordingly, for the reasons elaborated below, we affirm on the appeal, reverse on the cross-appeal, and remand with instructions.

**I. Background Facts and Proceedings**.

On June 9, 2000, Carl Lippolt ran a red light and struck Pamela Hook's vehicle, injuring her. The following year, Hook hired Trevino to represent her "in connection with injuries from [the] motor vehicle accident," according to their "Contract for Employment of Attorneys." Their agreement, signed July 12, 2001, provided for a contingent fee as follows:

> CONTINGENT FEE: In the event of recovery, the Client(s) shall pay Attorneys a fee based upon total recovery. This fee shall equal 33 1/3 percent of the recovery if settled without filing a suit or if recovery is made after suit is filed and prior to 21 days before trial or hearing date. The fee for settlement or recovery after 21 days before trial or hearing date and before notice of appeal shall equal 40% for any recovery made pursuant to this representation. IN THE EVENT NO RECOVERY IS MADE, ATTORNEYS SHALL RECEIVE NO FEE FOR SERVICES PERFORMED UNDER THIS CONTRACT.

On March 13, 2002, with nearly three months remaining on the two-year statute of limitations, Trevino filed Hook's first civil action against Lippolt alone. On April 8, Lippolt filed an answer to the petition that admitted his "negligence was a proximate cause of the collision and any resulting damages." In July, more than two years after the accident, Trevino served interrogatories. On September 6, Lippolt answered the interrogatories, disclosing for the first time that he had been serving as a volunteer driver for the Iowa Department of Human Services, transporting a patient for treatment, when he collided with Hook. On

May 23, 2003, Lippolt amended his answer to plead affirmative defenses based on Iowa Code section 669.24 (2001), which provides immunity from personal liability for state volunteers, and on Hook's failure to submit her tort claim to the state appeal board as required by section 669.13.

In June 2003, Trevino filed an administrative claim on Hook's behalf with the state appeal board. Trevino dismissed without prejudice Hook's lawsuit against Lippolt. After six months went by with no response from the board, Trevino withdrew Hook's administrative claim and filed a second civil action against Lippolt, this time naming the state as a codefendant. Lippolt and the state moved for summary judgment on statute of limitations grounds. Hook resisted, arguing her claims were timely under the discovery rule. Lippolt also moved for summary judgment on the volunteer-immunity defense, which Hook resisted on the theory that the statute protected only the volunteer's personal assets, not liability insurance. The district court denied defendants' motions for summary judgment, and we allowed their interlocutory appeal.

In *Lippolt,* we held Lippolt was immune from liability under the volunteer-immunity statute, Iowa Code section 669.24. 755 N.W.2d at 520–21. Moreover, we concluded the two-year statute of limitations was not tolled by the discovery rule. *Id.* at 524 ("As a matter of law, a reasonably diligent inquiry would have led to [timely] discovery of the State's liability."). We held both defendants were entitled to summary judgment. *Id.* at 527–28. Our discussion of Trevino's duty to investigate foreshadowed this malpractice action:

> If a duty to investigate the existence of a vicariously liable defendant did not arise until the injured party discovered the tortfeasor's immunity, the statute of limitations would never commence against a vicariously liable defendant in cases in

> which the tortfeasor is not immune. We think an injured party who knows of her injury and its cause must conduct a reasonable investigation of the nature and extent of her legal rights that includes inquiry into the identity of any vicariously liable parties. An injured party's duty to investigate the identity of persons liable for her injury is not a seriatim process that stops upon the discovery of one defendant and arises again only when that defendant's liability is questioned.

*Id.* at 523.

After our 2008 decision, Hook hired new counsel and filed a malpractice claim against Trevino on June 23, 2010. Hook asserted Trevino negligently failed to "promptly pursue inexpensive, necessary discovery to ascertain the proper identity of those who should be sued" and failed to timely file an administrative claim with the state appeal board. Trevino moved for summary judgment, arguing that, because the state's agent, Lippolt, was entitled to immunity under section 669.24, Hook's respondeat superior claim against the state failed as a matter of law. The district court denied his motion for summary judgment and, at trial, denied his motion for a directed verdict on the same grounds.

Trevino filed a motion in limine before trial to prevent Hook from arguing interest "should accrue from the time of a jury verdict in the underlying case." The district court, noting that "[p]rejudgment interest generally accrues from the time of filing suit," granted Trevino's motion, but stated, "This court will reconsider this order if an offer of proof . . . is made at trial." Hook made no offer of proof regarding interest or the date the underlying case likely would have gone to verdict.

The jury returned a verdict finding Trevino was negligent and that his negligence caused damage to Hook. The jury was asked to determine past and future damages, but was not asked to determine the date the underlying case should have been tried. The jury awarded the following damages on the verdict form:

| | | |
|---|---|---|
| 1 | Past pain and suffering from the date of injury to when a case against the State of Iowa would have been tried. | $125,000 |
| 2 | Present value of future pain and suffering determined as of when a case against the State of Iowa would have been tried. | $125,000 |
| 3 | Past loss of function of the mind and body from the date of injury to when a case against the State of Iowa would have been tried. | $22,000 |
| 4 | Present value of future loss of function of the mind and body determined as of when a case against the State of Iowa would have been tried. | $11,000 |
| 5 | Past loss of earnings from the date of injury to when a case against the State of Iowa would have been tried. | $5,000 |
| 6 | Present value of future earning capacity determined as of when a case against the State of Iowa would have been tried. | $125,000 |
| | Total | $413,000 |

In addition, the parties stipulated that Hook's past medical expenses amounted to $60,000. This brought the total award to $473,000. The district court entered judgment against Trevino in that amount with interest on the entire judgment, including future damages, running from June 23, 2010, the date the malpractice action was filed.

Trevino filed a posttrial motion to "offset the verdict by the contingent fee agreement" or, alternatively, by the reasonable value of his legal services. The district court denied that motion. Hook filed a motion seeking interest running from the time her original action would have been tried. The district court denied her motion for additional interest. Trevino's appeal and Hook's cross-appeal followed.

## II.  Scope of Review.

"We review a district court's ruling on a motion for directed verdict for correction of errors at law." *Pavone v. Kirke,* 801 N.W.2d 477, 486 (Iowa 2011). We review a ruling on a claimed setoff against a judgment

for correction of errors at law. *See Collins v. King*, 545 N.W.2d 310, 312 (Iowa 1996) (reviewing disability insurance setoff for correction of errors at law). Finally, a ruling on interest is reviewed for correction of errors at law. *Wilson v. Farm Bureau Mut. Ins. Co.*, 770 N.W.2d 324, 327 (Iowa 2009).

**III. Analysis.**

**A. State Volunteer Liability.** We first address Trevino's argument that he was entitled to a directed verdict because the volunteer immunity enjoyed by Lippolt under Iowa Code section 669.24 extended to the state to bar Hook's respondeat superior claim. This is a question of statutory interpretation.

The Iowa Tort Claims Act (ITCA) provides a limited waiver of the state's sovereign immunity. *See* Iowa Code ch. 669; *Hansen v. State*, 298 N.W.2d 263, 265 (Iowa 1980) ("The state may now be sued in tort only in the manner and to the extent to which consent has been given by the legislature."); *see also Thomas v. Gavin*, 838 N.W.2d 518, 521 (Iowa 2013) (citing Don R. Bennett, *Handling Tort Claims and Suits Against the State of Iowa: Part I*, 17 Drake L. Rev. 189, 189 (1968) ("Prior to passage of the Iowa Tort Claims Act in 1965, the maxim that 'the King can do no wrong' prevailed in Iowa.") (noting the ITCA is "viewed as abolishing traditional common law immunities")). "Generally, the State may be sued for damage caused by the negligent or wrongful acts or omissions of state employees while acting within the scope of employment to the same extent that a private person may be sued." *McGill v. Fish*, 790 N.W.2d 113, 117 (Iowa 2010) (citing Iowa Code § 669.2(3)(*a*) (2009)). "Employee of the state" is defined to include persons acting on behalf of the state "whether with or without compensation." Iowa Code § 669.2(4)(*a*) (2001); *see also Lippolt*, 755 N.W.2d at 519 ("[T]he term 'employee' as used in

chapter 669 includes unpaid volunteers as well as paid workers."). Hook argues the state can be sued by a party injured by the negligence of a volunteer such as Lippolt acting on behalf of the state. We agree.

Iowa enacted its state volunteer tort immunity provision in 1987.[1] 1987 Acts ch. 212, § 1 (now codified at Iowa Code § 669.24). Section 669.24 provides:

> A person who performs services for the state government or any agency or subdivision of state government and who does not receive compensation *is not personally liable* for a claim based upon an act or omission of the person performed in the discharge of the person's duties, except for acts or omissions which involve intentional misconduct or knowing violation of the law, or for a transaction from which the person derives an improper personal benefit. For purposes of this section, "*compensation*" does not include payments to reimburse a person for expenses.

Iowa Code § 669.24 (first emphasis added). We must determine if the legislature intended section 669.24 to bar a respondeat superior claim

---

[1]The 1987 Act also created a parallel provision that applies to municipalities, which states:

> A person who performs services for a municipality or an agency or subdivision of a municipality and who does not receive compensation is not personally liable for a claim based upon an act or omission of the person performed in the discharge of the person's duties, except for acts or omissions which involve intentional misconduct or knowing violation of the law, or for a transaction from which the person derives an improper personal benefit. For purposes of this section, "compensation" does not include payments to reimburse a person for expenses.

1987 Acts ch. 212, § 20 (now codified at Iowa Code § 670.2).

Many states enacted similar immunity statutes that decade "in response to the insurance crisis of the 1980s." *Developments in the Law—Nonprofit Corporations—Special Treatment and Tort Law*, 105 Harv. L. Rev. 1677, 1687 (1992). Not until 1997 did Congress enact a volunteer-immunity statute. *See* Volunteer Protection Act of 1997, 42 U.S.C. §§ 14501–14505 (2006). The Federal Volunteer Protection Act specifically provides that the volunteer's personal immunity does not extend to the government. It states: "Nothing in this section shall be construed to affect the liability of any nonprofit organization or governmental entity with respect to harm caused to any person." *Id.* § 14503(c). The ITCA lacks such a provision expressly excluding the governmental entity from the protection of the volunteer immunity.

against the state for the volunteer's negligence. As we observed in *Lippolt,* section 669.24 "states that a volunteer 'is not personally liable.'" 755 N.W.2d at 520 (quoting Iowa Code § 669.24). On its face, this provision sets forth an immunity defense that is personal to the volunteer and lacks any language expressly extending the volunteer's immunity to the state. Our prior cases do not address whether the state can invoke the volunteer's personal immunity to defeat a respondeat superior claim against the state based on the volunteer's negligence.

Trevino relies on our common law negligence decisions holding that an adjudication in favor of the agent on a negligence claim bars the plaintiff's vicarious-liability claim against the principal. *See, e.g., Peppmeier v. Murphy,* 708 N.W.2d 57, 66 (Iowa 2005); *Kulish v. Ellsworth,* 566 N.W.2d 885, 892 (Iowa 1997) (affirming dismissal of common law vicarious-liability claim against county whose allegedly negligent employees enjoyed statutory immunity). Hook, in turn, cites our precedent allowing a statutory vicarious-liability claim to proceed despite the personal immunity of a negligent agent. *See, e.g., Smith v. CRST Int'l, Inc.,* 553 N.W.2d 890, 895 (Iowa 1996) (construing motor vehicle owner liability statute); *Estate of Dean ex rel. Dean v. Air Exec, Inc.,* 534 N.W.2d 103, 105–06 (Iowa 1995) (construing aircraft owner liability statute). We conclude these cases can be harmonized. The plaintiff must establish the agent's negligence to recover against the principal under respondeat superior. Accordingly, an adjudication that the agent was not negligent will preclude the principal's vicarious liability. Yet a defense personal to the agent, such as immunity, will not ordinarily extend to bar a claim against the principal for the agent's negligence unless the rationale for the immunity also applies to the principal.

Thus, two inquiries guide our determination whether an adjudication against the plaintiff and in the agent's favor precludes recovery from the principal under respondeat superior. First, did the agent prevail on a personal defense inapplicable to the principal? Second, does the principal's vicarious liability rest on the agent's negligence or, rather, on the agent's liability?

The plaintiff may proceed with a respondeat superior claim against the principal despite a judgment in favor of the agent that is based on "a defense that was personal to the defendant." Restatement (Second) of Judgments § 51(1)(b) (1982).[2] In *Dean*, we explained:

---

[2]The Restatement (Second) of Judgments section 51 (1982) states in relevant part:

> If two persons have a relationship such that one of them is vicariously responsible for the conduct of the other, and an action is brought by the injured person against one of them, the judgment in the action has the following preclusive effects against the injured person in a subsequent action against the other.

> (1) A judgment against the injured person that bars him from reasserting his claim against the defendant in the first action extinguishes any claim he has against the other person responsible for the conduct unless:

> > . . . .

> > (b) The judgment in the first action was based on *a defense that was personal to the defendant in the first action.*

(Emphasis added.)

The Restatement (Second) of Agency section 217(b)(ii) (1958) contains a similar provision, which states:

> In an action against a principal based on the conduct of a servant in the course of employment:

> > . . . .

> > (b) The principal has no defense because of the fact that:

> > > . . . .

> > > (ii) the agent had an immunity from civil liability . . . .

We note the Restatement (Third) of Agency does not contain a comparable provision and is silent on this issue.

> "[A]n immunity from liability does not mean that a person did not commit a negligent, harmful act. It only means that for certain policy reasons liability is precluded against that person. In the interest of compensation to the victim, it should not be presumed that the immunity from liability given to the negligent person is carried over to others whom the victim can sue. Rather, the presumption should be the other way. Thus, unless the purpose of the immunity would be thwarted by carrying it over to others, suit against the others will lie."

534 N.W.2d at 105 (quoting *Davis v. Harrod*, 407 F.2d 1280, 1284 (D.C. Cir. 1969)); *see also Smith,* 553 N.W.2d at 895 (holding the vehicle owner's liability for the passenger's injuries "stems from the [driver's] alleged *negligence*, not [the driver's] liability for his negligence").

In *Dean,* a plane crash killed the pilot and passenger, who were coemployees on a business trip in a leased Cessna. 534 N.W.2d at 104. The passenger's estate sued the aircraft owner under Iowa Code section 328.41, which imposes civil liability "on the owner of an aircraft for the negligent conduct of those persons to whom the owner entrusts the plane." *Id.* The owner moved for summary judgment, arguing it could not be vicariously liable for the pilot's negligence because the pilot had coemployee immunity under the Iowa Workers' Compensation Act, Iowa Code section 85.20. *Id.* at 103–04. The district court denied the motion, reasoning that the immunity applied only to the coemployee pilot but not against the owner who was neither the employer nor a coemployee. We affirmed. *Id.* at 104. We held the immunity defense was personal to the pilot and was not available to the owner. *Id.* at 106. We noted the immunity under chapter 85 did not extend to third parties, while the aircraft owner liability statute "turns on the negligence of the operator." *Id.* at 104.

Similarly, in *Smith,* we held that vicarious liability under the motor vehicle owner-liability statute turned on the consent driver's negligence,

regardless of the driver's liability. 553 N.W.2d at 894. In *Smith*, the negligent driver who injured a coemployee passenger had immunity under the workers' compensation statute. *Id.* at 892. The vehicle owner was not their employer or coemployee. The owner liability statute provided, "In all cases where damage is done by any motor vehicle by reason of *negligence* of the driver, and driven with the consent of the owner, the owner of the motor vehicle shall be liable for such damage." Iowa Code § 321.493 (1991) (emphasis added). The *Smith* court emphasized that "[s]ection 321.493 mentions only the negligence, not the liability, of the operator." 553 N.W.2d at 895.

The *Smith* court recognized that the workers' compensation statute "provides a quid pro quo not for third parties, but for employers, who are required by law to carry workers' compensation insurance or become self-insured." *Id.* The *Smith* court stated, "We do not believe withholding section 85.20 immunity from [the nonemployer vehicle owner] thwarts the purpose underlying such immunity." *Id.* Therefore, the *Smith* court held the driver's coemployee immunity did not exempt the vehicle owner from vicarious liability for the driver's negligence. *Id.*; *cf. Steffens v. Proehl*, 171 N.W.2d 297, 298–300 (Iowa 1969) (holding workers' compensation immunity barred section 321.493 claim against vehicle owner who was also plaintiff's employer).

Trevino's reliance on *Peppmeier* is misplaced. That case was a medical malpractice action in which the plaintiff sued her surgeon for negligently performing surgery and sued the surgeon's employer under a respondeat superior theory, alleging it was vicariously liable for his negligence. 708 N.W.2d at 59. The district court granted both defendants summary judgment on grounds the plaintiff lacked expert testimony or other admissible evidence to prove the surgeon was

negligent. *Id.* at 61. The court of appeals affirmed summary judgment for the surgeon, but reversed summary judgment for his employer. *Id.* We granted the employer's application for further review. *Id.* We noted the plaintiff failed to seek further review of the appellate decision in favor of the surgeon, which left intact the summary judgment establishing she lacked evidence to prove his negligence. *Id.* at 62. We held summary judgment in favor of the surgeon was an adjudication on the merits that the surgeon could not be found negligent, which in turn precluded plaintiff's vicarious-liability claim against his employer. *Id.* at 66. By contrast, in *Lippolt,* we held Lippolt, the state's agent, was immune. 755 N.W.2d at 520–21. We did not hold Lippolt was not negligent. *Id.* An immune party may well be negligent under circumstances allowing a respondeat superior claim against the employer or principal based on its agent's negligence. This is such a circumstance.

*Kulish* is closer to the mark. There, decedent was injured in a car accident and died of a heart attack while being airlifted to a hospital. *Kulish,* 566 N.W.2d at 887. His estate brought negligence claims against emergency responders and a county hospital. *Id.* at 887–88. We held that "[s]ummary judgment for defendants based on the immunity provisions of section 670.4 was proper." *Id.* at 891–92. Specifically, we applied the emergency response immunity in section 670.4(11) of the Iowa Municipal Tort Claims Act. *Id.* at 890–92. Trevino seizes on language in which we denied the county's cross-appeal, stating the summary judgments in favor of the county employees, hospital, and ambulance service "necessarily justified dismissal of plaintiffs' claims against defendant Howard County, either on governmental immunity *or vicarious liability grounds.*" *Id.* at 892 (emphasis added) (citing Iowa Code § 670.4(11) (1995) and *Biddle v. Sartori Mem'l Hosp.,* 518 N.W.2d 795,

799 (Iowa 1994) (holding settlement with doctor extinguished further claims against defendant hospital based on vicarious-liability theory)).[3] The italicized language relied upon by Trevino is dicta because we dismissed the county's cross-appeal on the ground the county had prevailed under the emergency-response immunity. *Id.* at 892–93.

Importantly, the emergency response immunity at issue in *Kulish* expressly applies to both the local governmental entity (the county) and the individual emergency responders. *See* Iowa Code § 670.4 ("The liability imposed by section 670.2 shall have no application to any claim enumerated in this section. As to any such claim, [unless otherwise expressly provided], the municipality shall be immune from liability."). By contrast, the ITCA does not expressly apply the state volunteer immunity to the state. Nor is volunteer immunity one of the listed exceptions to tort liability enumerated in section 669.14, the ITCA's counterpart to section 670.4. *Id.* § 669.14. "[A] private citizen's right of suit under the Tort Claims Act is not absolute, but rather is limited by conditions set forth by the legislature in chapter 669." *Drahaus v. State*, 584 N.W.2d 270, 272 (Iowa 1998). "These limitations are most clearly manifested in the specific exceptions to the act," which are set forth in

---

[3]Nor is *Biddle* on point. That case involved a plaintiff's voluntary release of negligence claims against a doctor who paid plaintiff a "sizeable settlement." *Biddle*, 518 N.W.2d at 796. We held his release extinguished vicarious-liability claims against the hospital that employed him, but for reasons unique to the Iowa Comparative Fault Act and inapplicable here. *Id.* at 799. Specifically, the settlement made the doctor a "released party" under the Act who is immune to contribution claims. *Id.* at 798 & n.1 (citing Iowa Code §§ 668.3(2)(*b*), .7 (1985)). Moreover, a servant and vicariously liable master are considered a single party for allocation of comparative fault. *Id.* at 799 (citing § 668.3(2)(*b*)). We concluded that "[b]y releasing the doctor, Biddle satisfied the percentage of fault attributable to him and, vicariously, attributable to the hospital." *Id.* We noted this "outcome would clearly advance the goal of voluntary settlement of controversies favored by the law." *Id.* at 798–99. By contrast, Hook obtained no settlement from Lippolt, who is not a released party under chapter 668. *Biddle* is inapposite for that reason.

section 669.14. *Trobaugh v. Sondag*, 668 N.W.2d 577, 584 (Iowa 2003). If the legislature had intended volunteer immunity to apply to the state, it presumably would have said so expressly, as it did for the emergency response immunity in the Municipal Tort Claims Act. "We refuse to rewrite [the immunity and liability statutes] in a manner not consistent with the plain language of those statutes." *Smith*, 553 N.W.2d at 895.

We next turn to the purposes served by the statutory provisions. *See Harden v. State*, 434 N.W.2d 881, 884 (Iowa 1989) ("We seek a reasonable interpretation that will best effect the purpose of the statute . . . ."). "The self-evident purpose of the [ITCA] is to provide an orderly method by which to compensate those tortiously damaged by any officer, agent or employee of the state as defined by the Act." *Graham v. Worthington*, 259 Iowa 845, 853, 146 N.W.2d 626, 632 (1966). The *Graham* court elaborated:

> The general purpose of [the ITCA] is to impose upon all the people of this state the burden, expense and costs which arise from tortious damage to property or injuries to persons by the officers, agents and employees of our state government.

*Id.* at 860, 146 N.W.2d at 636–37. That purpose—compensating at state expense victims of the negligence of persons acting on the state's behalf—would be thwarted by extending the personal immunity of state volunteers to the state to deny recovery.

We find it equally self-evident that the purpose of section 669.24 is to encourage people to provide volunteer services to the state by removing the threat of personal liability. *See Zivich v. Mentor Soccer Club, Inc.*, 696 N.E.2d 201, 205 (Ohio 1998) ("[F]aced with the very real threat of a lawsuit, and the potential for substantial damage awards, . . . volunteers could very well decide that the risks are not worth the effort.");

*cf.* H.F. 39, 63rd G.A. (1969) (codified at Iowa Code § 613.17 (1971)) (creating immunity for Good Samaritans in order to "encourage persons to render emergency care or assistance without fear of being sued"). Notably, the Iowa legislature passed several other liability-limiting provisions in the same 1987 Act that created the volunteer immunity.[4] 1987 Acts ch. 212. As the federal volunteer-immunity statute acknowledges,

> it is in the interest of the [government] to encourage the continued operation of volunteer service organizations and contributions of volunteers because the [government] lacks the capacity to carry out all of the services provided by such organizations and volunteers[.]

42 U.S.C. § 14501(a)(7)(C); *see also* 101 Cong. Rec. H7548 (daily ed. Sept. 13, 1990) (statement of Rep. John Porter) (pointing to 1986 survey finding that fear of liability exposure was inhibiting volunteer recruitment). Arkansas passed its own volunteer-immunity statute in the same year as Iowa. It noted the motivations behind granting immunity to volunteers:

> [T]he recent publicity generated in relation to the perceived insurance crisis has heightened concern among many who would provide volunteer services, making it more difficult to provide certain important services, cultural and educational events, and other opportunities to the citizens of the State of Arkansas through voluntary services. This subchapter limits and defines the liability of volunteers in order to diminish their concern with regard to personal liability associated with volunteer work in order that the state might maximize this important human resource.

---

[4]The Act allowed for the elimination or limitation of personal liability for corporate, bank, credit union, and savings and loan association directors. 1987 Acts ch. 212, §§ 2, 12, 13 & 15 (codified at Iowa Code §§ 491.5, 524.302, 533.1 & 534.501 (Supp. 1987)). The Act also limited personal liability of directors, officers, members, and volunteers acting on behalf of a cooperative association, nonprofit-sharing cooperative association, corporation, or nonprofit corporation. *Id.* §§ 6, 7, 8, 9, 11 & 19 (codified at Iowa Code §§ 497.33, 498.35, 499.72, 504.17, 504A.101 & 613.19).

Ark. Code Ann. § 16-6-102 (West, Westlaw through 2013 Reg. Sess.).

The policy behind the volunteer-immunity statute—to encourage volunteering—does not warrant extending this immunity to the state. Immunizing the state for the actions of its volunteers would do little more than deny recovery to injured parties, undermining the compensatory goal of the ITCA. Yet, declining to immunize the state is unlikely to deter people from volunteering. Rather, extending volunteer immunity to the state would remove an incentive for the state to properly select, train, and supervise volunteers. *See* W. Page Keeton, et al., *Prosser and Keeton on the Law of Torts* § 69, at 500–01 (5th ed. 1984) (noting that vicarious liability incentivizes the principal "to be careful in the selection, instruction, and supervision of his servants, and to take every precaution to see that the enterprise is conducted safely"); *cf. Beganovic v. Muxfeldt*, 775 N.W.2d 313, 318 (Iowa 2009) ("The rationale for imposing liability on a [motor vehicle] owner is consistent with the rationale for . . . the common-law rule of vicarious liability for the master-servant relationship. The owner of a motor vehicle has the ability to control its use and to entrust the vehicle to competent drivers."). Our holding today furthers the purposes of both section 669.24 and the ITCA as a whole and is in accord with many other jurisdictions.[5]

---

[5]*See, e.g., James v. Prince George's County*, 418 A.2d 1173, 1183 (Md. 1980) (collecting cases in which government held liable as principal despite public official immunity); *Davis v. Lambert-St. Louis Int'l Airport*, 193 S.W.3d 760, 766 (Mo. 2006) ("Even when official immunity protects a government employee from liability there remains 'tortious conduct' for which the governmental employer can be derivatively liable."); *State ex rel. Sawicki v. Lucas Cnty. Ct. of Common Pleas*, 931 N.E.2d 1082, 1088 (Ohio 2010) ("[T]he doctrine of respondeat superior operates by imputing to the employer the acts of the tortfeasor, not the tortfeasor's liability."); *Babcock v. State*, 809 P.2d 143, 156 (Wash. 1991) (collecting cases in which the immunities of governmental officials do not also relieve the government of liability).

For these reasons, the district court correctly denied Trevino's motion for directed verdict. Lippolt's personal immunity as a state volunteer did not preclude a timely tort claim against the state based on Lippolt's negligence.[6]

**B. Contingent Fee Setoff.** Trevino argues the district court erred by denying his motion to reduce the malpractice damages awarded by the jury by the forty percent contingent fee he would have taken had the underlying tort action been successful. Trevino preserved error by presenting this legal issue to the district court through his posttrial motion seeking a setoff. *See Greenfield v. Cincinnati Ins. Co.*, 737 N.W.2d 112, 123 (Iowa 2007) (deciding setoff issues as a matter of law after trial). The malpractice jury verdict plus stipulated damages effectively measured the value of Hook's underlying tort case at $473,000. If Trevino had won that amount for her at trial in a tort action against the state, Hook would have been contractually obligated to pay his forty percent contingent fee. Her net recovery without interest would have been $283,800 ($473,000 x .6). Without the setoff, she grosses $189,200

---

[6]We limit our holding to the state volunteer-immunity provision at issue. Other immunities that preclude personal liability can defeat vicarious liability or respondeat superior claims when the purpose served by the immunity justifies applying it to both the agent and principal. "[I]mmunity is justified and defined by the *functions* it protects and serves, not by the person to whom it attaches." *Forrester v. White*, 484 U.S. 219, 227, 108 S. Ct. 538, 544, 98 L. Ed. 2d 555, 565 (1988). For example, we have extended a prosecutor's immunity to the county that employed him because,

> "otherwise, the objectives sought by immunity to the individual officers would be seriously impaired or destroyed. If the prosecutor must weigh the possibilities of precipitating tort litigation involving the county and the state against his action in (the) criminal case, his freedom and independence in proceeding with criminal prosecutions will be at an end."

*Burr v. City of Cedar Rapids*, 286 N.W.2d 393, 396 (Iowa 1979) (quoting *Gartin v. Jefferson County*, 281 N.W.2d 25, 31 (Iowa Ct. App. 1979)).

more in this malpractice action before paying her current legal counsel, who confirmed at oral argument he "is not working for free."

We have not previously decided whether a contingent fee setoff is appropriate in legal malpractice actions. Courts in other jurisdictions are divided on this question. As the Washington Supreme Court recently observed: "The majority view . . . refuses to deduct the negligent lawyer's fee in calculating damage to the plaintiff. This is the view espoused by the authors of the *Restatement (Third) of the Law Governing Lawyers*."[7] *Shoemake v. Ferrer*, 225 P.3d 990, 993 (Wash. 2010). The district court relied on the Restatement (Third) of the Law Governing Lawyers section 53, comment *c* (2000), which provides in relevant part:

> When it is shown that a plaintiff would have prevailed in the former civil action but for the lawyer's legal fault, it might be thought that—applying strict causation principles—the damages to be recovered in the legal-malpractice action should be reduced by the fee due the lawyer in the former matter. That is, the plaintiff has lost the net amount recovered after paying that attorney fee. Yet if the net amount were all the plaintiff could recover in the malpractice action, the defendant lawyer would in effect be credited with a fee that the lawyer never earned, and the plaintiff would have to pay two lawyers (the defendant lawyer and the plaintiff's lawyer in the malpractice action) to recover one judgment.

We, like the district court, find this comment persuasive. We thus join the majority today.

---

[7]This majority includes *Duncan v. Lord*, 409 F. Supp. 687, 691–92 (E.D. Pa. 1976); *Kane, Kane & Kritzer, Inc. v. Altagen*, 165 Cal. Rptr. 534, 537–58 (Ct. App. 1980); *Benard v. Walkup*, 77 Cal. Rptr. 544, 551 (Ct. App. 1969); *McCafferty v. Musat*, 817 P.2d 1039, 1045 (Colo. App. 1990); *Winter v. Brown*, 365 A.2d 381, 386 (D.C. 1976); *Togstad v. Vesely, Otto, Miller & Keefe*, 291 N.W.2d 686, 696 (Minn. 1980); *Carbone v. Tierney*, 864 A.2d 308, 320 (N.H. 2004); *Saffer v. Willoughby*, 670 A.2d 527, 534 (N.J. 1996); *Campagnola v. Mulholland, Minion & Roe*, 555 N.E.2d 611, 613–14 (N.Y. 1990); *Foster v. Duggin*, 695 S.W.2d 526, 527 (Tenn. 1985); *Shoemake v. Ferrer*, 225 P.3d 990, 993–94 (Wash. 2010).

We begin our analysis by recognizing "[t]he goal in legal malpractice suits is to put clients in the position they would have occupied had the attorney not been negligent." *Sladek v. K Mart Corp.*, 493 N.W.2d 838, 840 (Iowa 1992). But, the malpractice damage award should be limited "so as not to permit the client to profit from the lawyer's negligence." *Id.* If we allowed the setoff Trevino seeks, we would be giving him the benefit of a fee he never earned, while leaving Hook in a worse position in light of her undisputed obligation to pay the fees of the counsel who prosecuted her malpractice claims.

Hook had a good tort claim against the state. The state's agent, Lippolt, admitted running a red light and admitted his negligence caused the collision that injured her. Her stipulated medical expenses were $60,000. Although Lippolt enjoyed statutory immunity as a volunteer, that immunity did not extend to the state, as we hold today. Hook's tort claim against the state failed because Trevino missed the deadline to file it. The malpractice jury found Trevino negligent, a finding he does not challenge on appeal. We conclude he did not earn a fee from Hook's recovery. Therefore, we decline to reduce her malpractice recovery "by a fee that the lawyer never earned." Restatement (Third) of the Law Governing Lawyers § 56 cmt. *c.*

For her part, Hook would suffer a double deduction on fees—first, a deduction for Trevino's fictional forty percent fee; second, the fees paid to her counsel that actually won her malpractice case. We do not believe Iowa law compels this result. As the New York Court of Appeals recognized,

> if plaintiff had learned of defendants' malpractice and discharged them for cause, they could not claim credit for their fee. We see no reason to allow the defendants to

benefit by the fact that plaintiff belatedly learned of their misconduct and sued for recovery in legal malpractice.

*Campagnola v. Mulholland, Minion & Roe*, 555 N.E.2d 611, 614 (N.Y. 1990).

Two leading cases represent the minority viewpoint: *Moores v. Greenberg*, 834 F.2d 1105 (1st Cir. 1987), and *Horn v. Wooster*, 165 P.3d 69 (Wyo. 2007).[8]  These cases apply traditional tort and contract principles limiting damages to losses that were " 'reasonably within the contemplation of the contracting parties when the agreement was made' " and hold that malpractice damages thus are limited to the "net benefit of the tendered bargain-nothing more."  *Moores*, 834 F.2d at 1110 (quoting *Winship v. Brewer Sch. Comm.*, 390 A.2d 1089, 1095 (Me. 1978)); *see also Horn*, 165 P.3d at 73.  Both *Moores* and *Horn* disregard the argument that a plaintiff must pay twice for the same services, reasoning that this argument contradicts the American rule that parties bear their own legal fees.  *Moores*, 834 F.2d at 1111 ("In the absence of a statute, an enforceable agreement, or a recognized juridical exception to the general rule, counsel fees do not accrue in favor of a successful litigant."); *Horn*, 165 P.3d at 75.

We decline Trevino's invitation to follow the minority approach.  We find the *Horn* dissent more persuasive.  *See* 165 P.3d at 79–83 (Burke, J., dissenting) (noting several cases relied on by the majority opinion are no longer good law).  Under the minority view, "making a plaintiff whole"

---

[8]We note three other cases that are regularly cited to support prosetoff arguments: *Childs v. Comstock*, 74 N.Y.S. 643 (1902), *McGlone v. Lacey*, 288 F. Supp. 662 (D.S.D. 1968), and *Sitton v. Clements*, 257 F. Supp. 63 (E.D. Tenn. 1966).  *Childs* was abrogated by *Campagnola*, 555 N.E.2d at 613, and *Sitton* was abrogated by *Foster*, 695 S.W.2d at 527.  The *McGlone* court acknowledged the setoff rule, but decided the case based on other grounds.  288 F. Supp. at 665–66.  In recognizing the setoff rule, *McGlone* relied solely on *Sitton*.  *Id.*  Because *Sitton* is no longer good law, "*McGlone* retains little persuasive value."  *Horn*, 165 P.3d at 82 (Burke, J., dissenting).

consists of awarding the plaintiff only what the plaintiff would have recovered had the original attorney performed competently. "This logic, however, is somewhat self-destructing because the attorney has not handled the matter competently." *Kane, Kane & Kritzer, Inc. v. Altagen*, 165 Cal. Rptr. 534, 538 (Ct. App. 1980). We are not persuaded by Trevino's contention that Hook will be placed in a better position than if he had successfully prosecuted her tort claims against the state. Trevino basically asks us to pretend he won the tort case that he lost. He then asks us to compare apples to oranges—her theoretical *net* recovery in the underlying tort case, equated to her actual *gross* recovery in this legal malpractice action, exclusive of any deduction for the fees of the lawyers who in fact won her recovery. We will not turn a blind eye to the reality that the victim of legal malpractice must retain a second lawyer to recover from the first. The legal fees are a wash. *See Winter v. Brown*, 365 A.2d 381, 386 (D.C. 1976) (noting the attorney fees to prosecute the malpractice action "cancel out" the fees that would have been owed in the underlying case had it been successful).

The Washington Court of Appeals surveyed the cases and commentators on both sides of the issue. *Shoemake v. Ferrer*, 182 P.3d 992, 996–97 (Wash. Ct. App. 2008), *aff'd*, 225 P.3d 990. In joining the majority approach, the *Shoemake* court emphasized that "legal malpractice damages should fully compensate plaintiffs injured by attorney malpractice." *Id.* at 997. The court observed that "[i]n virtually every case, the injured plaintiff will be required to hire a second attorney to prosecute the malpractice action against the negligent attorney and will be required to pay that second attorney." *Id.* The court rejected the minority rule by stating:

> The replacement attorney is required to prove precisely what the negligent lawyer failed to prove—that the plaintiff is entitled to recover on the underlying claim. That this must be done through the vehicle of a malpractice action does not change the fact that the plaintiff's damages are limited to a single recovery on that underlying claim. By definition, reducing that recovery by two sets of attorney's fees leaves the plaintiff in a worse position than the client would have been in, absent the malpractice.

*Id.* The same reasoning applies in Iowa. To allow Trevino a setoff for his contingent fee would leave Hook less than whole once she paid the fees of the counsel who won her recovery. A fee setoff thus conflicts with our cases providing that the plaintiff is to be made whole. *See Sladek*, 493 N.W.2d at 840.

Trevino, in the alternative, seeks a setoff based on quantum meruit for the reasonable value of the services he performed. Several states have left open the possibility for negligent lawyers to set off malpractice awards based on quantum meruit. *See, e.g., Schultheis v. Franke*, 658 N.E.2d 932, 941 (Ind. Ct. App. 1995); *Strauss v. Fost*, 517 A.2d 143, 145 (N.J. Super. Ct. App. Div. 1986); *Campagnola*, 555 N.E.2d at 614; *Foster v. Duggin*, 695 S.W.2d 526, 527 (Tenn. 1985); *Shoemake*, 225 P.3d at 995 n.4; *accord* Samuel J. Cohen, *The Deduction of Contingent Attorneys' Fees Owed to the Negligent Attorney from Legal Malpractice Damages Awards: The New Modern Rule*, 24 Tort. & Ins. L.J. 751 (1989) (suggesting quantum meruit can "reconcile the facially opposed policies of both cases that deduct and cases that refuse to deduct"). The Indiana Court of Appeals summarized the rationale behind this approach:

> [Quantum meruit] will avoid a windfall to the client where the attorney has provided services beneficial to the client. Conversely, a client will not be forced to pay twice for the same services because counsel in the legal malpractice action presumably will prove only those portions of the underlying case that were not already completed by the negligent attorney. Nor will the negligent attorney be rewarded for his or her shoddy workmanship as fees will be

deducted only for legal services which actually benefited the client.

*Schultheis*, 658 N.E.2d at 941.

Other states have considered quantum meruit and rejected it as too difficult to administer. *See Carbone v. Tierney*, 864 A.2d 308, 320 (N.H. 2004) ("[I]t would be difficult for a jury to assign a value to the services provided by the first lawyer, particularly where there is considerable disagreement about whether those services benefited the client in any meaningful way."); *Horn*, 165 P.3d at 76 ("[A]ctual application of the theory would add unworkable complications to an already complicated case.").

In Iowa,

> [w]hen a contingency-fee case is concluded after the termination of the attorney-client relationship, the attorney is entitled to be paid the value of his services under a quantum-meruit theory, but not on the basis of the contract amount.

*Phil Watson, P.C. v. Peterson*, 650 N.W.2d 562, 567 (Iowa 2002). But, we decline to reverse the district court and allow a quantum meruit deduction on this record. Trevino's efforts did not benefit Hook. Trevino offered no expert testimony or other evidence of the reasonable value of the services he performed for Hook or how they benefited her. Hook's new counsel noted they used different experts (an economist and vocational rehabilitation expert) and presented live medical testimony. In addition, they had to retain a legal malpractice expert, a necessary expense to prove Trevino's negligence, but a cost that would have been avoided had the underlying tort action been prosecuted successfully against the state. Hook's ultimate recovery was delayed by years due to Trevino's negligence.

We leave open the possibility for a quantum meruit setoff from a legal malpractice recovery on an appropriate record. This is not such a record. We affirm the district court's ruling denying Trevino's posttrial motion for a setoff based on his contingent fee or quantum meruit.

**C. Interest.** The district court awarded Hook interest on the entire judgment, including the future damages, running from June 23, 2010, the date she filed her malpractice action. In her cross-appeal, Hook argues the district court erred by denying her posttrial motion for additional interest. Essentially, Hook seeks the interest that would have been recoverable on her underlying tort claim. In her posttrial motion, she sought interest on the entire judgment to commence on "the date the case against the State of Iowa would have been tried." The district court denied her motion, stating:

> The Plaintiff relies upon an exception to the statutory rule recognized in *Gosch v. Juelfs*, 701 N.W.2d 90, 92 (Iowa 2005): "Although in many instances interest is not recoverable on unliquidated damages prior to judgment, our cases have carved out a definite exception to this rule when it has been shown that the damage was complete at a particular time." This Court is inclined to believe that the damages in this case were complete at the time the case would have been tried against the State of Iowa. However, the jury was never asked to provide that date. Under these circumstances, it does not appear appropriate to provide for pre-judgment interest under the exception as opposed to the general rule.

In a footnote, the district court noted:

> This Court recalls no evidence or argument as to when the case against the State would have actually been tried. Moreover, under the instructions, it does not appear that the jury members would necessarily have had to unanimously agree on any particulate date.

We have not previously decided how to calculate interest accruing on a legal malpractice judgment arising from the loss of an underlying

tort claim. "The concept of prejudgment interest is based on the realization that the loss caused by tortious conduct results in the loss of use of compensatory damages, and to make the plaintiff whole, prejudgment interest should be allowed." *Opperman v. Allied Mut. Ins. Co.*, 652 N.W.2d 139, 142–43 (Iowa 2002); *see also Wilson*, 770 N.W.2d at 332 ("The purpose of allowing interest on the [underlying] tort judgment is 'to encourage prompt payment and to compensate the plaintiff for another's use of his or her money.' " (quoting 44B Am. Jur. 2d *Interest & Usury* § 40, at 63 (2007)); *Houselog v. Milwaukee Guardian Ins.*, 473 N.W.2d 52, 55 (Iowa 1991) ("[I]nterest is an element of compensatory damages.").

The statute governing interest on tort judgments against private parties is found in Iowa Code section 668.13 (2011), which states:

> Interest shall be allowed on all money due on judgments and decrees on actions brought pursuant to this chapter, subject to the following:
>
> 1. Interest, except interest awarded for future damages, shall accrue from the date of the commencement of the action.
>
> . . . .
>
> 4. Interest awarded for future damages shall not begin to accrue until the date of the entry of the judgment.

The measure of damages in a legal malpractice action, however, is the amount the plaintiff would have recovered in the prior tort action but for the lawyer's negligence. *Sladek*, 493 N.W.2d at 840. Interest is a component of those damages. The underlying case involved a tort claim against the State of Iowa. Interest on tort claims against the state is governed by section 669.4, which provides:

> The state shall be liable in respect to such claims to the same claimants, in the same manner, and to the same extent as a private individual under like circumstances,

> except that *the state shall not be liable for interest prior to judgment* or for punitive damages. Costs shall be allowed in all courts to the successful claimant to the same extent as if the state were a private litigant.

Iowa Code § 669.4 (emphasis added).

Trevino and Hook each offer a date to serve as the trigger for interest. Trevino urges we use June 23, 2010, the date Hook commenced her malpractice action against Trevino and the date the district court used to calculate interest. Trevino emphasizes that section 668.13 allows interest on "judgments." Because no judgment was ever entered in the underlying personal injury case against the state or Lippolt, Trevino argues that the underlying case cannot serve as a starting point for interest. Trevino asserts the only judgment in this litigation is the judgment against Trevino in favor of Hook and, thus, the district court correctly allowed interest accruing from the commencement of Hook's case against Trevino. Trevino argues the commencement of the malpractice action is the "commencement" to which section 668.13(1) refers.

Trevino's position is at odds with the measure of damages in legal malpractice actions. "The measure of injury to the client's cause of action is the difference between what the client should have recovered but for the [attorney's] negligence, and what the client actually recovered." *Burke v. Roberson*, 417 N.W.2d 209, 212 (Iowa 1987); *see also Sladek*, 493 N.W.2d at 840 ("The measure of damages in a legal malpractice claim is limited to those obtainable in the underlying suit . . . ."). Trevino recovered nothing for Hook in the underlying suit. Hook would have been entitled to recover statutory interest in the underlying tort action had it been successfully prosecuted. The damages in this malpractice action are intended to make her whole. She is less than

whole without an award of the interest that should have been recovered from the state.

Hook argues the district court erred by declining to award her interest based upon the date her underlying tort suit would have been tried, as this is the date her damages became "complete."[9] Hook asserts the "completed damages" rule from *Gosch* is applicable. That rule is an imperfect fit here. *Gosch* was not a legal malpractice action. At issue in *Gosch* was the date to accrue prejudgment interest on property damage to a vehicle destroyed in a collision. 701 N.W.2d at 90–91. We awarded interest on the property damage accruing from the date of the accident that totaled the vehicle. *Id.* at 91. Hook does not claim interest from the date of her personal injury accident with Lippolt. We have recognized the "completed damage" exception applies in wrongful-death cases because the injuries are complete upon death. *See Wilson*, 770 N.W.2d at 330 n.3 ("We have noted that actions for wrongful death fall within that exception."). But, we expressly declined to extend the wrongful-death exception to nonfatal personal injury claims in *Mrowka v. Crouse Cartage Co.*, 296 N.W.2d 782, 783–85 (Iowa 1980). This is because damages in serious, but nonfatal, personal injury claims such as Hook's are continuing rather than complete, and a jury verdict is necessary to assign a present value to future pain and suffering and other

---

[9]Hook's appellate brief calculates the trial date of the underlying action by beginning with the two-year ITCA statute of limitations date, June 9, 2002, and then adding on an additional two years through the exercise of various procedural mechanisms to extend the statute of limitations, withdraw the claim, and refile it. *See* Iowa Code § 669.5 (2001) (allowing the state appeal board six months to dispose of a claim under the ITCA before authorizing suit); Iowa R. Civ. P. § 1.944(2) (eff. Feb. 15, 2002) (requiring plaintiffs to try their cases within eighteen months of filing). On appeal, Hook proposed several alternative dates for the fictional trial: November 18, 2004, 2005, or 2006. Her posttrial motion proposed December 18, 2004, 2005, or 2006.

components of future damages. *See id.* at 784–85. No subsequent Iowa case has held nonfatal personal injuries are "complete" before judgment for purposes of accruing interest. Nor has Hook cited any legal malpractice case from any jurisdiction holding damages are complete for purposes of accruing interest at the time the underlying case would have been tried.[10]

In an analogous context, however, we have awarded interest from the filing date of the underlying tort action. In *Opperman*, plaintiff, William Opperman, was injured in a car accident and sued two different drivers for his injuries. 652 N.W.2d at 140. Ten months after commencing a tort action against the two drivers, Opperman brought his insurer, Allied Mutual, into the action, claiming under the underinsured-motorist (UIM) coverage of his policy. *Id.* The UIM claim against Allied was severed from the tort action. *Id.* Opperman subsequently settled with one driver, and a jury found in favor of the other. *Id.* A trial against Allied followed and Opperman was awarded the difference between his UIM coverage and the amount of his settlement. *Id.* Allied argued that the court should only enter prejudgment interest from the date Allied became a party to the action, not the original date Opperman filed his tort action against the drivers. *Id.* at 142. We disagreed, stating:

> Allied bound itself under its insurance policy to pay its insured what the insured would have recovered against a third party if that party had been adequately insured. By

---

[10]Other courts have limited interest to the date of the successful malpractice action, rejecting claims for interest accruing from the date the underlying tort action was or should have been filed or tried. *See, e.g., Tri-G, Inc. v. Burke, Bosselman & Weaver*, 856 N.E.2d 389, 411 (Ill. 2006) (declining to award interest from the date of a "hypothetical" prior judgment that should have been entered but for the malpractice); *Jourdain v. Dineen*, 527 A.2d 1304, 1307–08 (Me. 1987) (declining to award interest from the date the statute of limitations expired on an underlying claim that was never filed).

> statute that includes interest on past damages from the date
> the *tort* suit was filed.

*Id.* We concluded "[t]he commencement of interest does not turn on when Allied was brought into the litigation." *Id.* We elaborated that "it makes no difference whether the damages have been set by a jury in a direct tort action or in a hybrid action, such as this, in which the suit against the insurer measures the amount of recovery the plaintiffs would have realized in an underlying tort action." *Id.* at 141. It was Allied's duty to pay "for all interest the tortfeasor would owe and, under Iowa Code section 668.13, that would begin to accrue when the action was filed against the original tortfeasor." *Id.* at 142.

We recently applied the *Opperman* rule in another UIM case, *Wilson*, 770 N.W.2d at 331–32. There, the insurer sought to distinguish *Opperman* by noting the UIM claim in that case had been filed within the tort action. *Id.* at 332. We, nevertheless, held in *Wilson* that the UIM insurer owed prejudgment interest from the filing date of the prior, separate tort action. *Id.* We did so because the UIM measure of damages is based on what the plaintiff "would have received had the tortfeasor been financially solvent." *Id.* at 331–32. Prejudgment interest from the filing date of the tort action was therefore appropriate. *Id.* at 332.

The reasoning behind the *Opperman* rule applies to this legal malpractice action. In both UIM cases and legal malpractice cases, the measure of damages is based on what the plaintiff was entitled to recover in the underlying tort action. Those damages include statutory interest. We hold that a legal malpractice claimant is entitled to recover from the defendant attorney the interest that would have been recoverable in the underlying action. Prejudgment interest is not recoverable on tort claims

against the state. Iowa Code § 669.4. Rather, interest runs from the date of the judgment. Accordingly, we agree with Hook that interest should accrue from the date her underlying tort action against the state would have gone to judgment.

The district court declined to award Hook such interest because "the jury was never asked to provide that date," and Hook offered no evidence at trial "as to when the case against the State would have actually been tried." Trevino argues Hook failed to preserve error on her claim for this additional interest. The district court invited an offer of proof from Hook on matters excluded from evidence by the pretrial order in limine, including when the underlying case would have been tried. Hook made no offer of proof relating to this date. Nevertheless, we conclude error was preserved by Hook's posttrial motion and that the record is adequate to award the interest at issue. *See Opperman*, 652 N.W.2d at 140–41 ("It is true the jury did not add interest to the past damages, but interest may be properly computed and ordered by the court as additional damages to be included in the judgment.").

The last day a timely claim could have been made against the state was June 9, 2002 (two years after the personal injury accident). *See* Iowa Code § 669.13(1) (2001). Under the statute in effect at the time of the accident, if the state appeal board did not make final disposition of the claim within six months, the claimant could withdraw the claim from consideration and begin suit. Iowa Code § 669.5. Iowa Code section 669.13 then gave the litigants six months to file in district court after receiving a final disposition from the state appeal board or withdrawing the claim as permitted by section 669.5. Civil actions are to be tried within eighteen months of filing. *See* Iowa R. Civ. P. 1.944(2) (eff. Feb. 15, 2002). Accordingly, the underlying action most likely would

have been tried by December 9, 2004 (thirty months after the expiration of the statute of limitations). We conclude interest on Hook's judgment against Trevino should accrue from that date.

### IV. Disposition.

For the foregoing reasons, we affirm the district court's ruling denying Trevino's motion for directed verdict on the state volunteer-immunity issue and affirm the ruling denying his posttrial motion for a setoff for his contingent fee or quantum meruit. On Hook's cross-appeal, we reverse the district court's ruling that denied interest accruing before the filing date of the malpractice action. We remand for entry of an order awarding additional interest on the entire judgment, accruing from December 9, 2004.

**AFFIRMED ON APPEAL, REVERSED ON CROSS-APPEAL, AND REMANDED WITH INSTRUCTIONS.**